STATE OF CONNECTICUT *v.* RONALD PISKORSKI

COTTER, C. J., LOISELLE, BOGDANSKI, LONGO and PETERS, Js.

Argued January 5—decision released June 19, 1979

*Maxwell Heiman,* special public defender, with whom, on the brief, was *Ann T. Baldwin,* for the appellant (defendant).

*George D. Stoughton,* state's attorney, with whom was *Robert M. Meyers,* assistant state's attorney, for the appellee (state).

COTTER, C. J.  On the night of October 19, 1974, six persons were found murdered at the Donna Lee Bakery in New Britain.  Subsequently, the defendant, Ronald Piskorski, and one Gary Schrager were arrested in connection with the killings.  On March 24, 1975, a grand jury found a true bill of indictment accusing the defendant of six counts of murder and charging that he or another participant caused the death of six persons in the course of the commission of, or an attempt to commit, a robbery.  See General Statutes § 53a-54c.  After a trial by a jury of twelve, a verdict of guilty as charged was returned as to all six counts of the indictment, which was accepted and ordered recorded by the court on December 22, 1975.  The defendant's motion to set aside the verdict was denied, and he has appealed.

In his appeal, the defendant does not claim that the evidence presented was insufficient to support the verdict rendered.  Rather, he challenges a wide variety of rulings made by the trial court during the course of and prior to the trial, the court's charge to

the jury, and its denial of his motion to set aside the verdict. These numerous issues, as well as an additional exposition of the relevant facts involved in each, will be discussed seriatim.

# I

## GRAND JURY MOTIONS

Following his arrest, the defendant timely filed motions to require that a record be made of the grand jury proceedings and to permit counsel to be present during the grand jury proceedings. Both motions were denied by the court, and the defendant has claimed those rulings to be constitutional error.

## A

Although we agree with the defendant that recordation of grand jury testimony may well be a more acceptable procedure,[1] "[i]t has been unequivocally established in this state that neither precedent nor the due administration of justice *requires* . . . that a stenographic record be made of the grand jury proceedings. *State* v. *Delgado,* 161 Conn. 536, 539, 290 A.2d 338, remanded for resentencing, 408 U.S. 940, 92 S. Ct. 2879, 33 L. Ed. 2d 764; *State* v. *Vennard,* 159 Conn. 385, 390, 270 A.2d 837, cert. denied, 400 U.S. 1011, 91 S. Ct. 576, 27 L. Ed. 2d 625." (Emphasis added.) *State* v. *Cobbs,* 164 Conn. 402, 411–12, 324 A.2d 234, cert. denied, 414 U.S. 861, 94 S. Ct. 77, 38 L. Ed. 2d 112. "There is no constitutional . . . right to have a stenographer present in the grand jury room and we find no error in the refusal of the trial court to permit it in this case." *State* v. *Delgado,* supra, 540; accord, *United States* v. *Rubin,*

---

[1] General Statutes § 54-45a, which became effective on October 1, 1978, now provides for a transcript of the proceedings before a grand jury with the exception of the deliberations.

559 F.2d 975, 988 (5th Cir.); see *United States* v. *Ayers,* 426 F.2d 524, 528 (2d Cir.), cert. denied, 400 U.S. 842, 91 S. Ct. 85, 27 L. Ed. 2d 78.

## B

As the defendant recognizes, this court has consistently stated that there is no constitutional right that counsel be present at grand jury proceedings. *State* v. *Cobbs,* supra; *State* v. *Delgado,* supra, 539; *State* v. *Vennard,* supra; *State* v. *LaBreck,* 159 Conn. 346, 347–48, 269 A.2d 74; *State* v. *Stallings,* 154 Conn. 272, 282, 224 A.2d 718. The defendant argues, nevertheless, that since none of the above cases "expressly comes to grips with the rationale" of *Coleman* v. *Alabama,* 399 U.S. 1, 90 S. Ct. 1999, 26 L. Ed. 2d 387, we should reconsider our position that the presence of counsel at such proceedings is not constitutionally mandated.

In *Coleman,* the United States Supreme Court held that an Alabama preliminary hearing was a "critical stage" of that state's criminal process at which the accused was entitled to counsel. Id., 10. On the basis of that decision, the defendant suggests that we reexamine our holding in *State* v. *Stallings,* supra, that proceedings before a grand jury in this state are not a "critical stage" requiring the presence of counsel.

The precise claim raised by the defendant in the present case was recently rejected by the Second Circuit Court of Appeals in *Cobbs* v. *Robinson,* 528 F.2d 1331, 1338–39 (2d Cir.), cert. denied, 424 U.S. 947, 96 S. Ct. 1419, 47 L. Ed. 2d 354. In that case, the court noted that Connecticut grand jury proceedings are "readily distinguishable from" the Alabama preliminary hearing referred to in *Coleman,* supra; *Cobbs* v. *Robinson,* supra, 1339 n. 4;

and concluded that the dangers and circumstances which the United States Supreme Court has described as calling for the assistance of counsel are not present in this state's grand jury proceedings. Id., 1339.

The trial court was not in error in overruling the defendant's claim.

## II

### MOTION FOR CHANGE OF VENUE

The defendant next claims that the trial court's denial of his motion for a change of venue resulted in a denial of his right to a trial by an impartial jury, as guaranteed by the sixth amendment to the constitution of the United States and article first, sections 8 and 19 of the constitution of Connecticut,[2] and deprived him of due process of law in derogation of the fifth and fourteenth amendments to the constitution of the United States and article first, sections 8 and 9 of the constitution of Connecticut. The defendant bases his argument in this regard on the ground that "the massive pretrial publicity in this case resulted in an inherently prejudicial atmosphere in Hartford County."

As the facts contained in the trial court's limited finding on this issue make clear, to say that there was massive media coverage at the time the killings occurred understates the true extent of the publicity

---

[2] It has been noted that the "impartial jury" provision in the sixth amendment has not been held applicable to the states through the fourteenth amendment. Note, "Prejudicial Publicity in Trials of Public Officials," 85 Yale L.J. 123, 128–29, n. 33 (1975). In any event, where a claim of prejudicial publicity has been raised, there is some doubt as to whether any difference exists between the impartial jury requirement and the due process requirement of a fair trial since the United States Supreme Court has tended to equate the two. Ibid.; see, e.g., *Irvin* v. *Dowd*, 366 U.S. 717, 722, 81 S. Ct. 1639, 6 L. Ed. 2d 751.

which was generated. The trial court undertook a detailed examination of the geographical reach of the various news media which covered these events and obtained estimates as to the number of homes penetrated by each source of news reporting during the time in question. From these facts, it appears that the amount of publicity surrounding the murders was extensive and that evidence from three television stations, four newspapers, and three radio stations revealed that some news relating to these crimes reached a substantial number of homes in Hartford County.

For the most part, however, the publicity which surrounded this case occurred during the period immediately following the murders and at the time of the defendant's arrest. The crimes for which the defendant was indicted occurred on October 19, 1974, and the defendant was arrested on November 21, 1974. Consequently, the vast majority of the pretrial publicity occurred during the thirty-five day period from October 19, 1974, through November 22, 1974.[3]

Moreover, the trial court concluded that the publicity was not inflammatory or discriminatory; it was free from sensationalism; and it was fair,

---

[3] The trial court found, for example, that between October 20, 1974, and November 22, 1974, WPOP radio broadcast fifty-two news stories concerning the murders, but that WPOP carried no news of this case from November 23, 1974, until September 17, 1975, when it reported that a hearing was being held on a motion for change of venue.

Similarly, the New Britain Herald, a newspaper based in the town in which the murders occurred but limited in its coverage in the towns of Hartford County, was found to have published twenty-three separate editions of its newspaper between October 21, 1974, and December 5, 1974, which carried one or more stories relating to the murders, while, in the eight-month period between January 2, 1975, and September 18, 1975, it only published such stories in twelve different editions.

accurate, and substantially factual. In his brief, however, the defendant points to specific instances of media coverage which he claims exemplify the prejudicial nature of the pretrial publicity surrounding this case. The following examples, which the defendant has taken from the trial court's limited finding, include: a television news broadcast, including film footage, of the funeral services of one of the victims which was telecast by Channel 3[4] on the 11 p.m. news on October 21, 1974; media coverage of news conferences, one of which was for the purpose of announcing the arrest of the defendant in connection with the murders; reports of statements made at one or more news conferences by police representatives and the state's chief medical examiner;[5] extensive media coverage, including news bulletins, regarding the arrest of the defendant while he was in court awaiting disposition on other charges; publication of a copy of a police photograph of the defendant in the New Britain Herald at the time of his arrest as well as other media transmittals of the defendant's picture; a report in the New Britain Herald, prior to the arrest of the defendant on murder charges, that he was being questioned in connection with the murders and was arrested on unrelated charges which were listed in the news account; media coverage of preliminary court proceedings including the setting of bonds for the defendant; one radio station's report quoting a candidate for governor referring to the murders

---

[4] WFSB-TV is a Hartford-based television station operating as Channel 3. Channel 3 services the entire state of Connecticut, except for Fairfield County, and it is estimated that its 11 p.m. news is received on the average in approximately 120,000 homes.

[5] The defendant has neither directed us to the contents of these news conference comments regarding the case nor specifically claimed that the statements reportedly made were anything but factual.

as the "New Britain Bakery Massacre"; three news-casts on October 22, 1974, by a Hartford-based radio station which included speculation about a connection between the murders in question and a shooting in New Haven; and radio newscasts on November 22, 1974, quoting investigation sources concerning blood stains and the defendant and saying that the murders took place after a scuffle during which one of the perpetrators was recognized by his uncle, one of the victims.[6]

On the basis of the above, the defendant argues that the pretrial publicity in this case was "inherently prejudicial" or, in the alternative, "identifiably prejudicial" so as to render the trial court's denial of his motion for a change of venue constitutional error.

We note, at the outset, that "[w]hen requesting a change of venue, the defendant has the burden of showing that he could not receive a fair and impartial trial. *State* v. *Rogers,* 143 Conn. 167, 172, 120 A.2d 409, cert. denied, 351 U.S. 952, 76 S. Ct. 850, 100 L. Ed. 1476; *State* v. *Chapman,* 103 Conn. 453, 470, 130 A. 899. . . . Furthermore, the court exercises its discretion in the decision as to whether a change of venue should be granted. *State* v. *Rogers,* supra, 172; *State* v. *Luria,* 100 Conn. 207, 209, 123 A. 378." *State* v. *Hart,* 169 Conn. 428, 432–33, 363 A.2d 80. Notwithstanding the above general rules, however, the United States Supreme Court has stated that, due to the grave constitutional implications attending such pretrial rulings,

---

[6] These stories were reported in the morning hours of November 22, 1974, by WPOP radio, which serves the Hartford metropolitan areas as well as Springfield, Massachusetts, New Haven, Waterbury and Willimantic. On the basis of surveys used by WPOP for marketing information, in October of 1974, between 6 a.m. and 10 a.m. the station reached approximately 20,000 or 25,000 homes.

"appellate tribunals have the duty to make an independent evaluation of the circumstances." *Sheppard v. Maxwell,* 384 U.S. 333, 362–63, 86 S. Ct. 1507, 16 L. Ed. 2d 600. Hence, we consider the constitutional standard of fairness which requires that a defendant have "a panel of impartial, 'indifferent' jurors." *Irvin v. Dowd,* 366 U.S. 717, 722, 81 S. Ct. 1639, 6 L. Ed. 2d 751; *Murphy v. Florida,* 421 U.S. 794, 95 S. Ct. 2031, 44 L. Ed. 2d 589.

## A

### Inherent Prejudice

It has been stated that "[t]here is no mathematical formula to determine when the burden of proof should be on the accused to show actual bias or when the facts reveal inherent prejudices." Stanga, "Judicial Protection of the Criminal Defendant Against Adverse Press Coverage," 13 Wm. & Mary L. Rev. 1, 68 (1971). Although the general rule is that on appeal a defendant has the burden of proving actual jury prejudice if a conviction is to be reversed on grounds of prejudicial publicity; *Irvin v. Dowd,* supra, 723; *State v. Hart,* supra; there is no need to show actual prejudice in the jury box "in extreme circumstances where there has been inherently prejudicial publicity such as to make the possibility of prejudice highly likely or almost unavoidable. See *Estes v. Texas,* 381 U.S. 532, 542–43, 85 S. Ct. 1628, 14 L. Ed. 2d 543 (1966)." *Calley v. Callaway,* 519 F.2d 184, 204 (5th Cir.), cert. denied, 425 U.S. 911, 96 S. Ct. 1505, 47 L. Ed. 2d 760.

The United States Supreme Court presumed prejudice in the circumstances under which the trials were held in *Sheppard v. Maxwell,* supra; *Estes v. Texas,* supra; and *Rideau v. Louisiana,* 373 U.S. 723, 83 S. Ct. 1417, 10 L. Ed. 2d 663. *Sheppard*

involved "a trial infected not only by a background of extremely inflammatory publicity but also by a courthouse given over to accommodate the public appetite for carnival." *Murphy* v. *Florida,* supra, 799. In *Sheppard,* there was massive pretrial and trial publicity to which the jury was exposed which included, inter alia, live television coverage of a three-day inquest three months before trial at which the defendant was examined for more than five hours without counsel; massive publicity of "evidence" never offered in the trial including charges that the defendant was impeding the investigation, that he had committed perjury, and that a woman convict claimed Sheppard to be the father of her illegitimate child; and media accounts of the trial which summarized and interpreted the evidence devoting particular attention to that which incriminated the defendant, and which often drew unwarranted inferences from trial testimony. *Sheppard* v. *Maxwell,* supra, 354, 356–57. Moreover, the setting in which the *Sheppard* trial was held was described as follows: "[B]edlam reigned at the courthouse during the trial and newsmen took over practically the entire courtroom, hounding most of the participants in the trial, especially Sheppard." Id., 355. Similarly, in *Estes* v. *Texas,* supra, the court presumed prejudice where a two-day pretrial hearing was carried live by both radio and television and the trial itself was conducted in a "circus atmosphere" largely due to intrusions of the press which was allowed to sit within the bar of the court and to overrun it with television equipment.

By comparison, in *Rideau* v. *Louisiana,* supra, the court found inherent prejudice to exist on the basis of pretrial publicity alone. In that case, the defendant's "confession" to a murder, under police inter-

rogation, was broadcast three times by a television station in the community where the crime and the trial took place. Id., 724. On the basis of the above facts, the court held that it was a denial of due process for the trial court to refuse the defendant's request for a change of venue, and remarked: "For anyone who has ever watched television the conclusion cannot be avoided that this spectacle . . . in a very real sense *was* Rideau's trial—at which he pleaded guilty to murder. Any subsequent court proceedings in a community so pervasively exposed to such a spectacle could be but a hollow formality." Id. 726.

As we stated earlier, in the present case, neither party disputes the magnitude of the publicity which surrounded this case. Nevertheless, "[w]e cannot accept the position that 'prominence brings prejudice.'" *Hale* v. *United States,* 435 F.2d 737, 747 (5th Cir.), cert. denied, 402 U.S. 976, 91 S. Ct. 1680, 29 L. Ed. 2d 142. "One who is reasonably suspected of murdering [six persons] cannot expect to remain anonymous." *Dobbert* v. *Florida,* 432 U.S. 282, 303, 97 S. Ct. 2290, 53 L. Ed. 2d 344. Consequently, it is the content of the publicity with which we must primarily be concerned.

We are not persuaded, after a review of the record in the present case, that the news accounts complained of were responsible for creating "a trial atmosphere that had been utterly corrupted by press coverage." *Murphy* v. *Florida,* supra, 798. Here, the media coverage involved "straight news stories rather than invidious articles which would tend to arouse ill will and vindictiveness." *Beck* v. *Washington,* 369 U.S. 541, 556, 82 S. Ct. 955, 8 L. Ed. 2d 98. There were no pretrial reports of a confession by the defendant as in *Rideau* v. *Louisiana,* supra; and

the limited publicity regarding other unrelated charges against the defendant does not raise the presumption of prejudice on a constitutional level. *Murphy* v. *Florida,* supra, 798. In spite of those reports which were speculative in nature, we must agree with the trial court that the publicity was neither inflammatory nor discriminatory; it was free from sensationalism; and it was fair, accurate and substantially factual. Cf. *Sheppard* v. *Maxwell,* supra; see annot., "Pretrial Publicity in Criminal Case as Ground for Change of Venue," 33 A.L.R.3d 17, 46–51, § 8.

We conclude, therefore, that the pretrial publicity in the present case was not inherently prejudicial so as to deny the defendant his right to a fair and impartial trial.

## B

### Identifiable Prejudice

"Absent inherently prejudicial publicity which has so saturated the community as to have a probable impact upon the prospective jurors, there must be some showing of a connection between the publicity . . . and the existence of actual jury prejudice." *McWilliams* v. *United States,* 394 F.2d 41, 44 (8th Cir.); see *United States* v. *Capra,* 501 F.2d 267, 279 (2d Cir.).

The defendant points out, and the state does not dispute, that approximately 450 veniremen were questioned over an eleven-day period in order to select a jury of twelve and four alternates. According to the defendant, a majority of those questioned were excused for cause because they either knew the victims or the victims' friends or relatives, or because they admitted to having preconceived

notions of the defendant's guilt. In view of those facts, the defendant relies upon *Irvin* v. *Dowd,* 366 U.S. 717, 81 S. Ct. 1639, 6 L. Ed. 2d 751, in support of his claim of identifiable or actual prejudice.[7] The voir dire record in *Irvin,* however, indicated that eight of the twelve jurors finally placed in the jury box thought the defendant was guilty before the trial had actually begun. Id., 727. In addition, *Irvin* involved a situation where media reports of the defendant's confession to six murders were widespread and where there were television reports of public opinion surveys regarding the defendant's guilt and the punishment he should receive as well as other instances of prejudicial pretrial publicity. Id., 725–26.

In the present case, the defendant has not directed us to any portion of the voir dire examination of the jurors which would require a finding of constitutional unfairness as to the method of jury selection or as to the character of the jurors actually chosen.[8] See *Dobbert* v. *Florida,* supra, 303; see annot., 33 A.L.R.3d, supra, 58–71. Although the length to which the trial court must go in order to select jurors who appear to be impartial is a relevant factor in evaluating those jurors' assurances of impartiality; *Murphy* v. *Florida,* supra, 802–803; it is by no means conclusive. *State* v. *Herrington,* 41 Wis. 2d 757, 764, 165 N.W.2d 120. On the other hand, the facts that a large portion of the news reports in the present case occurred nearly a year before trial and that those accounts were, as we have said, mostly factual, militate against a finding

[7] In *Irvin* v. *Dowd,* 366 U.S. 717, 725–28, 81 S. Ct. 1639, 6 L. Ed. 2d 751, 268 out of 430 prospective jurors were dismissed for cause because they believed the defendant was guilty.

[8] The record before this court does not contain a transcript of the voir dire proceedings.

of actual prejudice in the instant case. *Murphy* v. *Florida,* supra, 802; *Calley* v. *Callaway,* supra, 208; see *People* v. *Speck,* 41 Ill. 2d 177, 242 N.E.2d 208.

Moreover, it is significant to note that at least one court has, in light of a defendant's failure to produce a complete record of the voir dire on appeal, *assumed* that the voir dire disclosed no prejudice on the part of the jurors finally selected to sit. *State* v. *Coty,* 229 A.2d 205, 212 (Me.).

Under the circumstances presented in this case, the defendant has failed to demonstrate that the trial court erred in concluding that the pretrial publicity was neither inherently nor identifiably prejudicial and that the defendant was able to obtain a fair trial by an impartial jury in Hartford County.

### III

#### SEQUESTRATION OF JURY

Pursuant to § 51-246 of the General Statutes,[9] the defendant requested the trial court to issue an order requiring that the jury remain together during the trial and until they were discharged by the court. The trial court's denial of that motion is the basis of one of the defendant's claims of error.

The defendant recognizes that it is entirely within the discretion of the trial court to require the jury to remain together until they are discharged. General Statutes § 51-246; *State* v. *Siberon,* 166 Conn. 455, 459, 352 A.2d 285. He argues, however, that, under the circumstances of this case, the trial court's refusal to sequester the jury during the course of

---

[9] "[General Statutes] Sec. 51-246. COURT MAY REQUIRE JURY TO REMAIN TOGETHER IN CERTAIN CASES. In the trial of any capital case or any case involving imprisonment for life, the court may, in its discretion, require the jury to remain together in charge of the sheriff during the trial and until they are discharged by the court from further consideration of the case."

the trial constituted a clear abuse of discretion and amounted to a denial of his "right to a trial by a fair and impartial jury" and deprived him of due process of law. We cannot agree.

As the defendant himself points out in his brief to this court, the trial court "instruct[ed] the jury throughout the trial to avoid television, radio, and newspaper accounts of the trial, and further instructed the jury not to let anyone discuss the case with them." Moreover, as we pointed out on another occasion where a similar claim was raised, "[s]ignificantly, no claim is made by the defendant that any juror did, in disregard of the court's instructions, read any newspaper article concerning the case, or that the defendant was in fact in any way prejudiced." *State* v. *Siberon*, supra. The defendant argues, nevertheless, that because of the extensive publicity and notoriety of the case, there was a real danger that the jurors might be exposed to the case outside of the courtroom and that the cautionary instructions would be insufficient to protect the defendant's right to a fair trial.

"If the mere opportunity for prejudice or corruption is to raise a presumption that they exist, it will be hard to maintain jury trial under the conditions of the present day." *Holt* v. *United States,* 218 U.S. 245, 251, 31 S. Ct. 2, 54 L. Ed. 1021. Consequently, it is only when there is shown to exist a " 'trial atmosphere . . . utterly corrupted by press coverage' "; *Dobbert* v. *Florida,* supra, 303; that unfairness of constitutional magnitude will be presumed. See *Sheppard* v. *Maxwell,* supra. Such was not the situation in the present case.

Where, as here, explicit warnings are given to the jurors by the trial court and no demonstration

of actual prejudice to the defendant has been made, the trial court's failure to sequester the jury, in the exercise of its discretion, is not reversible error. *State* v. *Siberon,* supra; *State* v. *Lippard,* 26 Ariz. App. 417, 549 P.2d 197; *People* v. *Yonder,* 44 Ill. 2d 376, 256 N.E.2d 321, cert. denied, 397 U.S. 975, 90 S. Ct. 1094, 25 L. Ed. 2d 270; *State* v. *Harding,* 291 N.C. 223, 230 S.E.2d 397; see *United States* v. *Arciniega,* 574 F.2d 931 (7th Cir.); *Young* v. *Alabama,* 443 F.2d 854, 856 (5th Cir.), cert. denied, 405 U.S. 976, 92 S. Ct. 1202, 31 L. Ed. 2d 251; see generally, annot. 72 A.L.R.3d 131, § 23; annot., 4 A.L.R. Fed. 310, § 4.

## IV

### ADMISSIBILITY OF WEAPONS

Over the objections of the defendant, the state was allowed to introduce into evidence Exhibit BBB, a 16 gauge sawed-off shotgun, and Exhibit CCC, a P-38 9 mm. pistol, alleged to have been used in the commission of the crimes, which, the defendant claims, constituted reversible error.

Of the six persons found dead at the scene of the crimes on October 19, 1974, one, John Salerni, had been slain by a shotgun blast and each of the others was killed by a bullet. During the investigation of the scene on that night, the following items were discovered by the police and were admitted into evidence at the trial: four 9 mm. bullets, one taken from the body of one of the victims; six 9 mm. casings, three of which were found on or near two victims' bodies; a lead fragment, found near Salerni's body; a fiber wad from a shotgun shell taken from Salerni's skull; lead slug fragments, fiber wad, plastic powder gas check and black mate-

rials found in the cellar directly below a floor tile with a hole in it near the body of Salerni; and lead fragments taken from Salerni's body at the autopsy.

At the trial, Christian D. Noury testified that he had been in possession of a P-38 pistol which the defendant and Schrager borrowed from him, with some cartridges, shortly before October 19, 1974, and that the defendant had indicated to Noury his desire to buy a shotgun. According to Noury, on October 17, 1974, the defendant and his companion bought an old 16 gauge double-barrel shotgun and obtained two shotgun shells from William Mindek. Noury identified Exhibit BBB as the shotgun which Mindek sold to the defendant; Mindek identified the shotgun as the one which had belonged to him and which he had sold to the defendant; and Donna Avery testified that she recognized Exhibit BBB as a shotgun which Mindek had owned and which the defendant had in his possession on October 16 or 17, 1974.

As related in Part VIII, infra, Noury further testified: on the night of October 19, 1974, he observed the defendant holding under a faucet what appeared to be the pistol the defendant had obtained from him and washing "something red" off it; Schrager handed the defendant the shotgun which Mindek had sold to him; at the defendant's request, Noury drove him to a point where they stopped by a pond; the defendant took a bandanna from his head and put the pistol and some wallets in it and left the car, returning without them; and the two then drove back to New Britain—the defendant having possession of the shotgun during the drive.

Testimony presented by the state also revealed that on October 22, 1974, the defendant went to the residence of Clifford Chamberland and Jeffrey

Chamberland and asked Clifford if he had found the gun. Thereupon, the defendant went into Jeffrey's bedroom and returned with a shotgun, after which he was told by Clifford that he could leave the gun in the bedroom. The shotgun, identified as Exhibit BBB, was turned over to the police on November 7, 1974, by Jeffrey Chamberland.

On November 20, 1974, a state police scuba diver recovered a bandanna from the pond to which Noury had driven the defendant on the night of October 19. Inside the bandanna were some wallets belonging to the male victims of the murders and the P-38 pistol.

In his appeal to this court, the defendant argues that the admission of the shotgun and pistol into evidence was erroneous since the shotgun was irrelevant to the crime for which the defendant was on trial,[10] and since the state failed to sustain its burden of proof on the chain of custody of both the shotgun and the pistol.

"The trial court has broad discretion in determining the relevancy of evidence. *Johnson* v. *Newell,* 160 Conn. 269, 277, 278 A.2d 776; *State* v. *Carnegie,* 158 Conn. 264, 273, 259 A.2d 628, cert. denied, 396 U.S. 992, 90 S. Ct. 488, 24 L. Ed. 2d 455; *State* v. *Smith,* 157 Conn. 351, 355, 254 A.2d 447. . . . 'Evidence is admissible when it tends to establish a fact in issue or to corroborate other direct evidence in the case. . . . No precise and universal test of relevancy is furnished by the law, and the question must be determined in each case according to the teachings of reason and judicial experience. *State* v. *Towles,* 155 Conn. 516, 523, 235 A.2d 639; *Pope Foundation, Inc.* v. *New York, N.H. & H. R. Co.,* 106 Conn. 423, 435, 138 A. 444.' *Federated Department Stores, Inc.*

---

[10] The defendant does not dispute the relevancy of the pistol.

v. *Board of Tax Review,* 162 Conn. 77, 82, 291 A.2d
715." *State* v. *Schaffer,* 168 Conn. 309, 317, 362 A.2d
893.

Contrary to the defendant's assertion, the present
case does not involve a situation where there was
no evidence presented suggesting that the shotgun,
Exhibit BBB, had any connection with the case.
See *State* v. *Ferraro,* 160 Conn. 42, 45, 273 A.2d 694.
In addition to the testimony and evidence noted
previously, a witness for the state identified items
found at the scene of the murders, including items
taken from the body of Salerni, as components
of .16 gauge shotgun shells. The fact that the evi-
dence presented by the state did not scientifically
establish that Exhibit BBB *was* the shotgun used
in the commission of these crimes did not render
this evidence inadmissible when viewed in light of
all the other evidence tending to support the reason-
able inference that it was in fact the same weapon.
See *State* v. *Brown,* 168 Conn. 610, 616, 362 A.2d
910; *State* v. *Groos,* 110 Conn. 403, 407–408, 148 A.
350; *State* v. *Warren,* 292 N.C. 235, 239, 232 S.E.2d
419; 40 Am. Jur. 2d, Homicide, § 414.

We find no error in the trial court's exercise of
its broad discretion in determining the relevancy of
Exhibit BBB; the weight to be accorded such evi-
dence was properly for the consideration of the jury.
See *State* v. *Brown,* supra, 617–18.

Similarly we reject the defendant's claim that
both the pistol and the shotgun were rendered inad-
missible because of the state's failure to sustain its
burden of proof regarding the chain of custody of
these items.

"As a general rule, it may be said that the prose-
cution is not required or compelled to prove each

and every circumstance in the chain of custody beyond a reasonable doubt; the reasonable doubt must be to the whole evidence and not to a particular fact in the case. *United States* v. *Hall,* 198 F.2d 726, 730–31 (2d Cir.); 30 Am. Jur. 2d, Evidence § 1172; 53 Am. Jur., Trial § 771. . . . There is no hard and fast rule that the prosecution must exclude or disprove all possibility that the article or substance has been tampered with; in each case the trial court must satisfy itself in reasonable probability that the substance had not been changed in important respects. *United States* v. *S. B. Penick & Co.* [136 F.2d 413, 415 (2d Cir.)]. The trial court must also decide under the same test of reasonable probability whether the identification and nature of contents is sufficient to warrant its reception in evidence. *United States* v. *Clark* [425 F.2d 827, 833 (3d Cir.)]; *United States* v. *Gallego* [276 F.2d 914, 917 (9th Cir.)]; *United States* v. *S. B. Penick & Co.,* supra. The court must consider the nature of the article, the circumstances surrounding its preservation and custody and the likelihood of intermeddlers tampering with it in making its determination; and there is no rule which requires the state to produce as witnesses all persons who were in a position to come into contact with the substance sought to be introduced in evidence. *United States* v. *Gallego,* supra. The ruling of the trial judge may not be overturned except for a clear abuse of discretion. *United States* v. *Von Roeder,* 435 F.2d 1004, 1008 (10th Cir.); *United States* v. *Clark,* supra; *United States* v. *Gallego,* supra." *State* v. *Johnson,* 162 Conn. 215, 232–33, 292 A.2d 903; *State* v. *Chesney,* 166 Conn. 630, 638, 353 A.2d 783, cert. denied, 419 U.S. 1004, 95 S. Ct. 324, 42 L. Ed. 2d 280; see McCormick, Evidence (2d Ed.) § 212.

Under all the circumstances, we find no such clear abuse of the trial court's discretion in admitting the weapons into evidence.

## V

### ADMISSIBILITY OF BULLETS AND CASINGS

The four 9 mm. bullets and six 9 mm. casings allegedly found by the police at the scene of the crimes (see Part IV, supra) were admitted into evidence by the court subject to the defendant's motion to strike the admission of these exhibits if the state failed to establish, through subsequent testimony, the chain of custody and substantially unchanged condition of these items. Claiming that the state failed to satisfy those conditions upon which the exhibits had been admitted, the defendant contends that the court committed reversible error in failing to strike those exhibits as requested.

The defendant's claim is primarily based upon the facts that the testimony of FBI agent James A. Porter, Jr., and Connecticut state policeman John R. Witte regarding the transportation of these exhibits to the FBI Laboratory in Washington, D.C., failed to account for a period of nine days in November, 1974, and one day in January, 1975; that Porter only identified the plastic vials in which these items were kept and which bore his initials rather than the contents of the containers; and that Witte never specifically testified that these exhibits were in substantially the same condition at the time of trial as when he found them at the murder scene.

As we noted previously in this opinion, "[e]ach and every circumstance in the chain of custody need not be proved beyond a reasonable doubt." *State v. Chesney,* supra. The state presented testimony detailing the transfer of these exhibits among vari-

ous members of the state police and FBI; the marking of the vials and the items contained therein; the inventories of the items while in the possession of the police; and the security precautions taken to ensure against unauthorized access to these exhibits. Considering the nature of these articles, the testimony regarding the circumstances surrounding their preservation and custody and the likelihood of intermeddlers tampering with them, we cannot conclude that the trial court's denial of the defendant's motion to strike the admission of these exhibits constituted such a clear abuse of discretion so as to warrant reversal. See *State* v. *Chesney,* supra; *State* v. *Johnson,* supra, 232–33.

## VI

### Admission of Photographs

During the course of the trial, the court admitted into evidence, over the defendant's objections, six photographs which depicted the victims as they allegedly were found at the scene of the crime on the evening of October 19, 1974. Prior to its admission, each photograph was identified as a fair and accurate representation of various portions of the scene of the murders on the night in question. Exhibit U, which depicted the two female victims, was offered by the state to demonstrate the position of the bodies, to represent the scene of the homicide, and to help establish that it was a homicide. Exhibit V, which showed one of the victims, also showed where the bullet struck the victim, a note near the victim's hand, and a cartridge case. Exhibit W portrayed one of the male bodies and revealed that his back trousers pocket was turned out. Exhibit X, a photograph in which one of the bodies is shown, was offered to show the scene observed by the witnesses

upon their arrival, to indicate the manner in which the victim was shot, and to aid in establishing the homicide. Exhibit Y, depicting the body of a victim, was introduced following testimony indicating that the photograph showed a piece of fibre from a shotgun shell in the victim's wound. And Exhibit Z depicted the body of a female near whose head could be seen a 9 mm. cartridge shell.

The defendant argues that it was error to allow the admission of these photographs into evidence claiming that they were highly inflammatory and that the prejudicial effect of these photographs far outweighed any probative value derived therefrom. It is the defendant's contention that, "when viewed in conjunction with other testimony and other exhibits presented by the state, these photographs were clearly unnecessary, and can lead only to the conclusion that the purpose [of their introduction into evidence] was only to inflame and prejudice the jury."

As this court has stated on a number of occasions, we adhere to the general rule that photographs which "have a reasonable tendency to prove or disprove a material fact in issue or shed some light upon some material inquiry" are not rendered inadmissible simply because they may be characterized as "gruesome." *State* v. *LaBreck*, 159 Conn. 346, 351, 269 A.2d 74; *State* v. *Smith*, 174 Conn. 118, 122, 384 A.2d 347; *State* v. *Conte*, 157 Conn. 209, 215–16, 251 A.2d 81, cert. denied, 396 U.S. 964, 90 S. Ct. 439, 24 L. Ed. 2d 428; annot., 73 A.L.R.2d 769, 787; 3 Wharton, Criminal Evidence (13th Ed.) § 637. When, however, an initial determination is made by the trial court that such photographs may have the tendency to prejudice or inflame the jury, the admissibility of such evidence is dependent upon the trial

court's determination as to whether their value as evidence outweighs their possible prejudicial effect. *State* v. *Smith,* supra; *State* v. *Dubina,* 164 Conn. 95, 102, 318 A.2d 95; *State* v. *LaBreck,* supra; *State* v. *Hanna,* 150 Conn. 457, 461, 191 A.2d 124; *Thibodeau* v. *Connecticut Co.,* 139 Conn. 9, 14, 89 A.2d 223. Since the trial court exercises its broad discretion in such circumstances, its determination will not be disturbed on appeal unless a clear abuse of that discretion is shown. *State* v. *Smith,* supra, 123; *State* v. *Schaffer,* 168 Conn. 309, 313, 362 A.2d 893; *State* v. *Dubina,* supra; *State* v. *LaBreck,* supra, 351–52.

The defendant places great stress upon the fact that, in view of the other testimony and exhibits presented by the state, the photographs in question were an unnecessary part of the state's case. The test for determining the admissibility of such photographs is, however, relevancy and not necessity. *People* v. *Kopp,* 275 Cal. App. 2d 38, 79 Cal. Rptr. 601. Moreover, photographs of a corpse have been held properly admissible in prosecutions for homicide in spite of a claim that they constitute merely cumulative evidence.[11] *State* v. *Hanna,* supra; 3 Wharton, supra; annot., 73 A.L.R.2d 769, 807. It cannot be doubted that to offer wholly irrelevant evidence of a gruesome character merely to inflame the members of the jury would be indefensible and intolerable. "On the other hand, the prosecution, with its burden of establishing guilt beyond a reasonable doubt, is not to be denied the right to prove every essential element of the crime by the most

---

[11] As one court has pointed out, the issue whether allegedly inflammatory photographs are cumulative is a "routine [issue] basic to a determination of relevancy, and not [an issue] arising from any 'exceptional nature' of the proffered evidence." *State* v. *Wright,* 265 So. 2d 361, 362 (Fla.).

convincing evidence it is able to produce." *State* v. *Jensen,* 209 Or. 239, 280, 296 P.2d 618, appeal dismissed, 352 U.S. 948, 77 S. Ct. 329, 1 L. Ed. 2d 241, rehearing denied, 352 U.S. 990, 77 S. Ct. 388, 1 L. Ed. 2d 369; see *State* v. *Hanna,* supra; *State* v. *Bailey,* 79 Conn. 589, 602, 65 A. 951.

Even if we were to agree with the defendant that the photographs in the present case may have had a possible prejudicial effect upon the jury, we cannot agree with the defendant that the potential for prejudice far outweighed the probative value of the evidence so as to render their admission into evidence an abuse of the court's broad discretion. Where, as here, much of "the evidence in a case is such as to indicate that a crime was committed with extreme atrocity and violence, photographs, regardless of their gruesomeness, can add little to inflame or prejudice the jury." 3 Scott, Photographic Evidence (2d Ed.) § 1231; *People* v. *Stoudt,* 90 Ill. App. 2d 140, 232 N.E.2d 800.

The court did not abuse its broad discretion in admitting the photographs.

## VII

### CHAMBERLAND CROSS-EXAMINATION

The defendant claims error in the trial court's refusal to allow him the right to cross-examine Clifford Chamberland, a state's witness, in the presence of the jury as to Chamberland's allegedly inconsistent grand jury testimony on the grounds that such refusal denied the defendant his right of confrontation and cross-examination as guaranteed by the state and federal constitutions and amounted to a deprivation of due process of law.

Prior to the testimony of Chamberland, three witnesses called by the state identified a shotgun which

the state claimed was used in the murders. The shotgun, introduced into evidence as state's Exhibit BBB, was identified by Christian Noury as the one which William Mindek sold to the defendant and his companion and which the defendant had on the night of October 19, 1974. Similarly, William Mindek identified the shotgun as one which had formerly belonged to him and which he had sold to the defendant. And Donna Avery testified that she recognized Exhibit BBB as a shotgun which Mindek had owned and which the defendant had in his possession on October 16 or 17, 1974.

After the foregoing testimony and consequent introduction of the shotgun into evidence, Clifford Chamberland was called as a witness by the prosecution. On direct examination, following Chamberland's testimony as to the defendant's possession of a shotgun on the night of October 22, 1974, the following exchange took place:

"Q. Mr. Chamberland, may I show you this item which has been marked Exhibit BBB, and ask you if you recognize it (handing)?

A. Yes. That could be it.

Mr. Heiman: Well, now, that doesn't answer the question, if the court pleases. The question is whether or not he recognizes it. I'm going to ask that the answer go out.

The Witness: Recognizes the—

The Court: The answer may go out. The jury will disregard it, that it could be it.

Q. Let me ask you if you do recognize it, Mr. Chamberland.

A. That—I thought the—this—

Mr. Heiman: Well, no, if your Honor please, the question is, "Do you recognize it or not?"

The Witness: Yes.

Q. You do recognize it?

A. I didn't see it for any length of time or study it. You know, closely. Like it is now."

On cross-examination by defense counsel, Chamberland testified that the shotgun, Exhibit BBB, was, according to his recollection, the same weapon that he previously testified was in the defendant's possession on October 22, 1974.[12] Upon further cross-examination, however, the witness stated that the shotgun in evidence "must be" the same gun he saw, and initially indicated that, at the time of his appearance before the grand jury in this case, the police suggested to him that the weapon he was to be shown in court was the same one that Chamberland claimed to have seen on October 22, 1974.[13]

---

[12] "Q. Are you sure, Mr. Chamberland, that the gun that Mr. Stoughton showed you, the shotgun, Exhibit BBB, is the same gun, the one you just described to us as Mr. Piskorski having broken? Let me show it to you again. Is that, according to your recollection, the same weapon that you saw Mr. Piskorski break at your home on the 22nd of October and show you the chambers?

A. Yes."

[13] As indicated below, the witness subsequently denied that anyone *told* him it was the same gun he saw, stating that he was simply *asked* if it was the same one.

"Q. Well, let me withdraw the question. Mr. Chamberland, you don't know whether that's the same gun or not, do you, really? Isn't that right?

A. *All I know is it must be. . . .*

Q. Did somebody suggest to you that that was the gun, Mr. Chamberland?

A. I don't know how to answer that. You mean did the police suggest that that is the gun? That's what you're saying, isn't it?

Q. *Did anyone suggest to you that the gun you were going to be shown in this courtroom was the same one that you claim to have seen in your home on the 22nd of October of 1974?*

A. *Yes, the police.*

Q. Who suggested it to you? Who told you that?

A. At the grand jury trial.

Q. Who told you at the grand jury trial —

A. They didn't tell me.

When it became apparent that defense counsel's questioning was directed at what occurred before the grand jury itself, the state objected to any further cross-examination in the presence of the jury.

The defendant claimed that, under the sixth amendment to the United States constitution, he had a right to pursue this line of questioning in order to establish that the witness had made a prior inconsistent statement with respect to the identification of the shotgun before the grand jury. The state, on the other hand, objected to such questioning on the grounds that grand jury proceedings are

Q. — that that gun was going to be the same one that was in your house? Who told you that?

A. *They didn't tell me. They asked me if that was the same gun that was at my house.*

Q. Who asked you?

A. Could be —

Q. One of the grand jurors?

A. — Shay or Ormsby.

Q. No?

A. No.

Q. Not one of the grand jurors? One of the police officers who interviewed you, is that right?

A. Yes.

Q. Which police officer? Was it Lieutenant Shay?

A. It could be.

Q. Do you remember?

A. I don't remember who it was. No. . . .

Q. You talked to a policeman the day of the grand jury proceedings, is that correct?

A. Yes.

Q. Did the policeman have the weapon, the shotgun, when he talked with you? Yes or no?

A. In the grand jury itself, yes.

Q. Did you physically handle that weapon?

A. No.

Q. Was it shown to you by whomever had the weapon?

A. Yes.

Q. Under what circumstances was it shown to you?

A. In front of the grand jury.

Q. All right. Where were you and where was the individual standing with the weapon when that was done?" (Emphasis added.)

secret and on the grounds of relevancy.[14] The court initially ruled that "if this witness made an inconsistent statement anywhere, grand jury room or otherwise, you may inquire as to — limited strictly to what that statement was in the grand jury room on this particular issue, and this only."

In the absence of the jury, an offer of proof was then made during which the following exchange between defense counsel and the witness took place:

"Q. Do you recall, Mr. Chamberland, testifying before the grand jury that you had seen the shotgun so briefly that you were unable to say whether or not that gun was the same gun that you had seen in your home on October the 22nd, 1974? . . .

A. When I spoke before the grand jury, I think —what went on then—at that time, I believe I still wasn't completely positive that it was the same gun.

Q. And did you, in fact, so testify before the grand jury, that you had seen the gun so briefly that you were—

A. No, I didn't—

Q. Just a minute, please — that you were unsure as to whether or not that was, in fact, the same gun that you had seen?

A. I did not testify that way before the grand jury.

Q. Did you testify that it was the same gun?

A. Sort of. I— 'It looks like the same gun.' I don't believe I gave a definite answer then, either.

---

[14] "Mr. Stoughton:   The objection, your Honor, is based on the secrecy of the grand jury proceedings.   Nobody knows.   There's no record of what went on in there.   We don't know what happened. We don't know whether there was any inconsistency or whether there wasn't.   It's not relevant."

Q. You didn't give it definite, either, did you?

A. I don't think so."

After a discussion between the court and counsel over whether Chamberland's grand jury testimony was in fact inconsistent with his testimony at trial, one final question was asked of the witness:

"Q. You were asked before the grand jury that that was the same gun. You told them you didn't know, it looked like it, isn't that right?

A. I said that — that it looked like the same gun. I just said it looked like the same gun. I mean —"

On the basis of the above testimony, the court sustained the objection of the state to this line of inquiry stating that the proffered testimony was "not sufficiently inconsistent so that I would permit the examination." [15] The defendant took an exception and has claimed that ruling to be error in his appeal to this court.

The defendant argues that the court's refusal to allow his questioning of Chamberland in the presence of the jury regarding the witness' grand jury testimony was a denial of the defendant's constitutional right to confront this witness. The defendant relies heavily upon a federal habeas corpus case involving the use of grand jury testimony for impeachment purposes during a trial in a court of this state. *Chesney* v. *Robinson*, 403 F. Sup. 306 (D. Conn.), aff'd without opinion, 538 F.2d 308 (2d Cir.), cert. denied, 429 U.S. 867, 97 S. Ct. 177, 50 L. Ed. 2d 147. In *Chesney*, the trial court sustained the state's objection to defense counsel's attempt to show the inconsistent testimony of a cru-

---

[15] "The Court: All right. I'm going to rule in the judgment of the court it's not sufficiently inconsistent so that I would permit the examination. Looked like and is. We are dependent upon memory."

cial[16] state's witness before the grand jury. The trial court's ruling was based upon the joint grounds that the witness' prior omission in his grand jury testimony would not be inconsistent and that an attempt to question a witness concerning his prior testimony before a grand jury would violate the Connecticut rule of secrecy of grand jury proceedings. Id., 308. On appeal to this court, we affirmed the defendant's conviction. *State* v. *Chesney,* 166 Conn. 630, 636–37, 353 A.2d 783, cert. denied, 419 U.S. 1004, 95 S. Ct. 324, 42 L. Ed. 2d 280.

In the federal habeas action, *Chesney* v. *Robinson,* supra, the District Court concluded that the trial court's ruling, as affirmed by this court, "deprived the petitioner of his opportunity to fully present to the jury his theory that the chief prosecution witness had fabricated a significant portion of his testimony." Id., 310. The federal court rejected what it considered to be the reasoning behind this court's affirmance of the defendant's conviction, that is, "that, since the grand jurors are sworn to secrecy, and since there is no transcript of the grand jury proceedings, there is no way in which the trial judge could properly determine the preliminary issue of whether a statement or omission before the grand jury was sufficiently inconsistent to justify its introduction for impeachment purposes." (Footnotes omitted.) Id.

In contrast, in the present case the trial court explicitly rejected the state's claim that the ques-

---

[16] The witness, who had been a suspect in the slaying himself and was the only witness to the shooting and to the incriminating statement allegedly made by the victim, admittedly had given a prior inconsistent statement to the police at the start of their investigation. *Chesney* v. *Robinson,* 403 F. Sup. 306, 308 (D. Conn.), aff'd without opinion, 538 F.2d 308 (2d Cir.), cert. denied, 429 U.S. 867, 97 S. Ct. 177, 50 L. Ed. 2d 147.

tioning of Chamberland could not be pursued because of the Connecticut rule of secrecy of grand jury proceedings and because, without a transcript of those proceedings, there is no way to determine if in fact there was an inconsistency. Moreover, also unlike the situation in *State* v. *Chesney, supra,* 635–36, the trial court in the present case permitted defense counsel to pursue this line of questioning outside the presence of the jury in order to ascertain the existence of a prior material inconsistency. Consequently, the decision to disallow the questioning of Chamberland in the jury's presence regarding his grand jury testimony was based solely upon the trial court's determination that the statements were not sufficiently inconsistent so as to permit their admission into evidence.

In *Davis* v. *Alaska,* 415 U.S. 308, 94 S. Ct. 1105, 39 L. Ed. 2d 347, the right to cross-examine was held to outweigh the state's interest in maintaining the secrecy of juvenile court proceedings. And in *Dennis* v. *United States,* 384 U.S. 855, 86 S. Ct. 1840, 16 L. Ed. 2d 973, the court held, as a matter of supervision over lower federal courts, that in federal criminal proceedings the interest in grand jury secrecy must yield to the interest in effective cross-examination. Likewise, this court has stated that the general rule regarding the secrecy of grand jury proceedings is not applicable in cases where the testimony of a witness at the trial is different from his testimony before the grand jury. *State* v. *Coffee,* 56 Conn. 399, 410, 16 A. 151; *State* v. *Fasset,* 16 Conn. 457, 466–67.

To say that the interests in secrecy must yield to the right of cross-examination, however, does not compel a conclusion that, in this case, the trial judge

erred in refusing to allow the admission of such testimony in the jury's presence. To be admissible, the court must first be persuaded that the statements are indeed inconsistent. *United States* v. *Hale,* 422 U.S. 171, 176, 95 S. Ct. 2133, 45 L. Ed. 2d 99; *Grunewald* v. *United States,* 353 U.S. 391, 418, 77 S. Ct. 963, 1 L. Ed. 2d 931; *Schurgast* v. *Schumann,* 156 Conn. 471, 482, 242 A.2d 695; 3A Wigmore, Evidence (Chadbourn Rev. 1970) § 1040. Since the purpose of such evidence is "to induce the tribunal to discard the one statement because the witness has also made another statement which cannot at the same time be true"; 3A Wigmore, op. cit.; the inconsistency must be substantial and relate to a material matter. *People* v. *Curtis,* 48 Ill. App. 3d 375, 386, 362 N.E.2d 1319; 98 C.J.S., Witnesses § 583. In determining whether an inconsistency actually exists, the testimony of the witness as a whole, or the whole impression or effect of what has been said, must be examined. *State* v. *Hephner,* 161 N.W.2d 714, 719 (Iowa); *Commonwealth* v. *West,* 312 Mass. 438, 440, 45 N.E.2d 260; *State* v. *Bowen,* 247 Mo. 584, 598, 153 S.W. 1033; 3A Wigmore, op. cit.; 98 C.J.S., Witnesses, supra. Moreover, statements from which a possible inference of inconsistency may be drawn are insufficient for the purpose of impeachment. *Gilmartin* v. *D. & N. Transportation Co.,* 123 Conn. 127, 134–35, 193 A. 726; 98 C.J.S., Witnesses, supra.

The relevant trial testimony of Chamberland regarding the identification of Exhibit BBB may be summarized as follows: On direct examination by the state, the witness answered affirmatively when asked if he recognized the shotgun; when that question was again asked, Chamberland stated, "I didn't see it for any length of time or study it. You know, closely. Like it is now." On cross-examination, the

witness responded in the affirmative when asked whether Exhibit BBB was, according to his recollection, the same weapon that he previously testified was in the defendant's possession on October 22, 1974. Upon further cross-examination, however, Chamberland was asked: "[Y]ou don't know whether that's the same gun or not, do you, really? Isn't that right?" To that question the witness replied, "All I know is it must be."

With the jury absent, the witness testified as to what he said before the grand jury as follows: "When I spoke before the grand jury I think — what went on then — at that time, I believe I still wasn't completely positive that it was the same gun." Chamberland denied that he told the grand jury that he had seen the gun so briefly that he was unsure as to whether it was the same gun, and indicated that he did not think that he gave a definite answer to the grand jury when asked if Exhibit BBB was the same gun he had seen. Finally, the witness stated that he told the grand jury it "looked like" the same gun.

Taking the testimony of Chamberland in its entirety, and examining the whole impression or effect of what was said, we conclude that the trial court did not abuse its discretion in limiting the scope of the cross-examination of Chamberland. *State* v. *Dortch,* 139 Conn. 317, 325, 93 A.2d 490. In view of all the circumstances, the court could have concluded that the statements sought to be introduced were not sufficiently inconsistent so as to warrant their admission into evidence. *Grunewald* v. *United States,* supra; *Schurgast* v. *Schumann,* supra; 3A Wigmore, op. cit. The defendant's reliance upon *Davis* v. *Alaska,* 415 U.S. 308, 94 S. Ct.

1105, 39 L. Ed. 2d 347, and *Smith* v. *Illinois,* 390 U.S. 129, 88 S. Ct. 748, 19 L. Ed. 2d 956, is, therefore, misplaced.

The purpose of this line of questioning pursued by the defendant in the present case was obviously to impeach the credibility of the witness. It is important to note that, following the trial court's ruling excluding the inquiry into the witness' grand jury testimony, the witness unequivocally stated upon further questioning by the defense, in the presence of the jury, that he was not positive or sure Exhibit BBB was the same weapon he saw on the night of October 22, 1974.[17]  Consequently, unlike the situation in *Chesney* v. *Robinson,* supra, 310, the defendant was not deprived of his opportunity to present adequately to the jury his theory that Exhibit BBB was possibly not the same gun seen by Chamberland on October 22.

## VIII

Motions re Psychiatric Examination of Witness

The defendant contends that the trial court erred in denying his two motions requesting a psychiatric examination of Christian D. Noury, a witness for the prosecution.

Prior to the trial testimony of the witness Noury, defense counsel conducted a preliminary examination, outside the presence of the jury, in an attempt

---

[17] "Q. Everything else you're sure of, is that right?  Everything else you testified to today you're sure of?

A. No.

Q. You're not sure that that's the shotgun, are you?

A. I'm not positive.

Q. You're not sure, are you?

A. Yes.

Q. You don't really know?

A. Yes."

to determine whether the witness should be subjected to a mental examination before being permitted to testify. During the course of that preliminary examination by the defense, Noury stated that he had "in the past" used the hallucinogenic drug "acid," and the amphetamine commonly known as "speed." Noury said that he did not remember the last time he had used "acid," but indicated that he had taken no form of drug in months.

On the basis of the above preliminary testimony, the defendant claimed that the witness should not be permitted to testify before the jury without a psychiatric examination. The court, stating that it had no basis to conclude that Noury was not a competent witness at the time, denied the defendant's motion for examination.

Following the direct examination of Noury in the presence of the jury, during which he testified, in part, to his observations of the defendant's activities[18] and to a statement claimed to have been made by the defendant on the night of the murders, the witness was questioned on cross-examination by the defense regarding his own activities on that date. Noury testified that, on October 19, 1974, he arrived at a house party some time between six and seven o'clock in the evening and smoked hashish and possibly drank some wine during the "couple of

[18] Included in Noury's observations were the facts that the defendant, after arriving at the party, put a pistol which looked like the witness' pistol (later identified by him as one of the alleged murder weapons) under a kitchen faucet and something red ran off it; that the defendant's companion handed him a shotgun, later identified as Exhibit BBB, one of the alleged murder weapons; and that, at the defendant's request, Noury borrowed a car and drove the defendant to a place alongside a pond whereupon the defendant tied the pistol and some wallets in a bandanna and got out of the car for a few minutes.

hours" prior to the defendant's arrival.[19]  Thereafter, the witness underwent an extensive cross-examination regarding various aspects of his testimony.

Sometime after Noury had completed his testimony, defense counsel again moved the court for a psychiatric examination indicating that Noury's activities on the night in question may have affected his judgment and his ability to observe the facts to which he testified.  The court denied this second motion stating, inter alia, that since the amount of hashish and the amount of wine, if any, consumed by Noury were unknown, any medical or psychiatric opinion as to the effect that they might have had upon the witness would be highly speculative.

The defendant argues, relying almost exclusively upon our decision in *Taborsky* v. *State,* 142 Conn. 619, 116 A.2d 433, that the denial of his motions resulted in the trial court's having an inadequate basis upon which to decide the issue of Noury's competence, and deprived the defendant of his right to present admissible psychiatric testimony to the jury to impeach the credibility of this witness.

On the question of competency, the defendant points to our suggestion in *Taborsky* v. *State,* supra, in which we granted the defendant a new trial on the basis of newly discovered evidence regarding the serious mental abnormalities of a crucial state's witness, that a motion for a mental examination of a witness is properly made at the time he is called to testify.  Id., 630.  In *Taborsky,* we noted that the trial court at no time had the question of the wit-

---

[19] During this cross-examination of Noury, he also admitted using "pot" and "hashish" in the months of October and November, 1974, and admitted using "speed" in the "first couple of weeks in the month"—presumably the month was October, 1974.

ness' competency properly presented to it by a timely challenge and production of evidence allowing for a determination of the witness' mental condition "at a most opportune moment." Id., 630, 632.

At the trial in the present case, in contrast, the question of Noury's competence was timely and properly presented to the trial court for its preliminary determination. See *Holcomb* v. *Holcomb*, 28 Conn. 177, 179. It is well settled that " '[t]he competency of a witness is a matter peculiarly within the discretion of the trial court and its ruling will be disturbed only in a clear case of abuse or of some error in law. *State* v. *Orlando*, 115 Conn. 672, 675, 163 A. 256. The considerations which should govern the determination of competency are the proposed witness' maturity to receive correct impressions by his senses, ability to recollect and narrate intelligently, and ability to appreciate the moral duty to tell the truth. *State* v. *Segerberg*, 131 Conn. 546, 547, 41 A.2d 101; *Kuczon* v. *Tomkievicz*, 100 Conn. 560, 570, 124 A. 226.' *State* v. *Manning*, 162 Conn. 112, 115, 291 A.2d 750; see McCormick, Evidence (2d Ed.) § 62." *State* v. *Siberon*, 166 Conn. 455, 457–58, 352 A.2d 285.

The trial court in the present case properly considered whether there was sufficient doubt as to the competency of Noury to warrant his examination. *State* v. *Manning*, supra. On the basis of the facts elicited during the preliminary examination and the court's own observation of the witness' demeanor, it satisfied itself on the question of his competency according to the principle enunciated in *State* v. *Segerberg*, supra, and concluded that a psychiatric examination was not required. "The trial court did not misapply any principle of law or, on the facts appearing of record, depart from a reasonable

determination of the competency of [Noury]."[20]
*State* v. *Manning*, supra. " 'The court is not bound
to order an examination on the question [of compe-
tency] merely because counsel for the accused
requests that it be done, where the court, after
hearing the testimony of the witness, has no doubt
of his mental soundness.' " *State* v. *Vars*, 154 Conn.
255, 268, 224 A.2d 744.

We similarly reject the defendant's claim that the
trial court committed reversible error in denying
his second motion for a mental examination. Again
referring to *Taborsky* v. *State*, supra, the defendant
argues that the denial of his motion "deprived the
defendant of his right to present admissible psy-
chiatric testimony to the jury to impeach the credi-
bility of [Noury]." We disagree.

The trial court explicitly rejected any suggestion
that the defendant would be prevented from fully
cross-examining Noury on the question of his mental
condition on the night of October 19, 1974; and, as
noted above, such an inquiry was in fact conducted.
See generally, annot., "Use of Drugs as Affecting
Competency or Credibility of Witness," 65 A.L.R.3d
705, § 5 [b]. Moreover, although defense counsel
indicated his intention to bring in a psychiatrist to
testify as to his judgment and to renew the motion
for an examination at that later date, such testi-
mony was apparently never produced.

Since there was no evidence as to the strength
or quality of the substance smoked by the defendant
or the quantity of "hashish" or wine ingested on

---

[20] It has been widely held that drug use per se, even within two
days of testifying, does not render a witness incompetent to testify.
See *United States* v. *Harris*, 542 F.2d 1283, 1302–1303 (7th Cir.);
annot., "Use of Drugs As Affecting Competency or Credibility of
Witness," 65 A.L.R.3d 705, § 3 (and cases cited).

the night in question, we cannot say that the trial court abused its discretion in denying the defendant's motion for a psychiatric examination of Noury on the grounds that any expert opinion as to the effect of those activities upon him at the time would, under the circumstances, necessarily be speculative. See *United States* v. *Pacelli,* 521 F.2d 135 (2d Cir.), cert. denied, 424 U.S. 911, 96 S. Ct. 1106, 47 L. Ed. 2d 314; *Ledbetter* v. *United States,* 350 A.2d 379 (D.C. App.); *State* v. *Looney,* 294 N.C. 1, 240 S.E.2d 612; *State* v. *Klueber,* 81 S.D. 223, 132 N.W.2d 847; McCormick, op. cit., § 45; see also Juviler, "Psychiatric Opinions as to Credibility of Witnesses: A Suggested Approach," 48 Calif. L. Rev. 648, 663 (1960). The trier, as the sole judge of the credibility of a witness; *State* v. *Mitchell,* 169 Conn. 161, 170, 362 A.2d 808; *State* v. *Farrah,* 161 Conn. 43, 49, 282 A.2d 879; was, in the present case, fully apprised of the facts claimed by the defendant to be relevant to that assessment with regard to the testimony of Noury.

## IX

### MOTION FOR MISTRIAL

During the course of the trial, Lorraine Ostertag was called as a witness by the state. Among other things, Ms. Ostertag testified on direct examination that she allowed Christian Noury to borrow her 1969 Pontiac automobile on October 19, 1974.[21] The witness further testified that on or about November 18, 1974, she had a conversation with the police after

---

[21] As noted previously in this opinion, Noury testified that on October 19, 1974, the night of the murders, he had borrowed Lorraine Ostertag's car and, at the defendant's request, drove him to a point alongside a pond. Noury further testified that the defendant tied a gun and some wallets in a bandanna and got out of the car for a few minutes, returning without them.

which the police towed the car away from her house with her permission, and indicated that she had owned that automobile for almost one year prior to October 19, 1974. The following question was then asked by the state: "During that — that almost one year, do you know whether or not you or any other person or animal had bled in that automobile?"

Before the question could be answered, the defendant objected, asked that the jury be excused, and, in their absence, made a motion for a mistrial "on the ground that the state has prejudiced the defendant's rights." The court sustained the defendant's objection, whereupon the defendant requested that if the motion for a mistrial was denied, the court nevertheless admonish the jury to draw no inferences whatever from the question propounded by the state. The court granted the defendant's request for a curative instruction and denied the motion for a mistrial, to which the defendant duly excepted. Upon the return of the jury, the court made the following remarks: "All right. The objection to the question is sustained. And I'm going to ask the jury to disregard it completely, the question that was asked. Or any implication or inference from that question. Wipe the question completely from your mind, and disregard any implication that might have been contained in the question. You may proceed, counsel."

The defendant claims that he was deprived of his rights to an impartial jury and due process of law because of the question asked by the state and by the court's subsequent denial of his motion for a mistrial. The defendant further contends that the prejudicial impact of the improper question upon the jury was not cured by the court's subsequent instruction that the jury disregard the question and any

implication or inference from it. In this regard, he refers to the evidence before the jury at the time regarding the extent of blood at the scene of the crimes as well as to the testimony of one police investigator concerning a possible heel print found on the premises. According to the defendant, the state posed the objectionable question with the intention that the jury would make a connection between the blood at the scene, the possible heel print and the defendant's alleged presence in the Ostertag vehicle, knowing that the admissibility of any evidence of blood found in the car was "dubious at best."[22]

" 'The general principle is that a mistrial should be granted only as a result of some occurrence on the trial of such a character that it is apparent to the court that because of it a party cannot have a fair trial. *Izzo* v. *Crowley,* 157 Conn. 561, 565, 254 A.2d 904; *Ferino* v. *Palmer,* 133 Conn. 463, 466, 52 A.2d 433.' " *State* v. *Grayton,* 163 Conn. 104, 112, 302 A.2d 246, cert. denied, 409 U.S. 1045, 93 S. Ct. 542, 34 L. Ed. 2d 495. Although it is true that "a state's attorney should scrupulously avoid questions of probable impropriety, we recognize that 'the trial

---

[22] Following the testimony of Ms. Ostertag, Trooper Witte was recalled by the state and testified that he had searched the car. In the absence of the jury, the state explained that the right floor rug was removed from the car and that blood was found on it but that it could not by typed or identified as human. The court sustained the defendant's objection to this line of questioning stating that "the possible prejudice would far outweigh any probative value in this case," thereby prohibiting such testimony to be elicited in the jury's presence.

We note that the defendant does not specifically claim that the present case involves an instance of intentional prosecutorial misconduct relating to the cross-examination of a witness in a criminal trial. See *State* v. *Hafner,* 168 Conn. 230, 249-51, 362 A.2d 925, cert. denied, 423 U.S. 851, 96 S. Ct. 95, 46 L. Ed. 2d 74.

judge is the arbiter of the many circumstances which may arise during a trial'; *State* v. *Marquez,* 160 Conn. 47, 52, 273 A.2d 689; [and that] '[t]he trial court has a wide discretion in passing on motions for mistrial.' *State* v. *Savage,* 161 Conn. 445, 449, 290 A.2d 221." *State* v. *Brown,* 169 Conn. 692, 703, 364 A.2d 186. Moreover, we have consistently recognized that a careful, cautionary instruction given by the trial court is a relevant factor to be considered in determining whether the denial of such a motion constituted an abuse of the trial court's broad discretion. See *State* v. *Ruiz,* 171 Conn. 264, 274, 368 A.2d 222; *State* v. *Savage,* supra, 448–49; *State* v. *Miller,* 154 Conn. 622, 631, 228 A.2d 136.

In the present case, the question, which was unanswered by the witness, could have left the jury with the impression that "blood" was found in her automobile. Within minutes, the court instructed the jury to completely disregard the question and any implication given or inference which could be drawn from it. Under those circumstances we cannot agree with the defendant that the denial of his motion for a mistrial was reversible error.

"Not every admission of inadmissible hearsay or other evidence can be considered to be reversible error unavoidable through limiting instructions." *Bruton* v. *United States,* 391 U.S. 123, 135, 88 S. Ct. 1620, 20 L. Ed. 2d 476. It is only in those " 'extreme cases where it appears that the question . . . is clearly calculated to inflame the minds of the jury and is of such character as to suggest the impossibility of withdrawing the impression produced on their minds' "; *State* v. *Hafner,* supra, 252–53; that a cautionary instruction will be deemed insufficient to obviate any possible harm to the defendant. Id.;

see *Bruton* v. *United States,* supra;[23] *State* v. *Savage,* supra; *State* v. *Santello,* 120 Conn. 486, 491, 181 A. 335. We reject the suggestion that such a characterization can be applied to the objectionable question involved in this case.

Under all the circumstances, and in view of the prompt cautionary instruction given by the trial court, we conclude, therefore, that the court's denial of the defendant's motion for a mistrial was well within its judicial discretion and did not amount to an infringement of the constitutional rights of the accused.

## X

### LaChance Testimony

Elizabeth LaChance, the defendant's stepsister, testified for the state regarding the defendant's activities on the days which followed the murders for which the defendant was on trial. Her relevant testimony may be summarized as follows: On October 20, 1974, the day after the night on which the murders took place, Piskorski, Schrager and a girl named Abby were in Maine, the state in which the witness LaChance resided at the time. Sometime after 7:30 that evening, the witness and her husband accompanied the defendant and his companions to the Holiday Inn in Brunswick, Maine where they "had a few drinks." The bill for those drinks, which came to between $50 and $70, was

[23] In *Bruton* v. *United States,* 391 U.S. 123, 135, 88 S. Ct. 1620, 20 L. Ed. 2d 476, the court recognized the inadequacy of cautionary instructions in a joint trial where "the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored." In *Bruton,* the court concluded that such a situation existed where, in a joint trial, evidence of a codefendant's confession inculpating the defendant was heard by the jury.

paid by the defendant and Schrager but it was not known how much of that amount was paid by each. On October 22, 1974, a date about which the witness was by no means certain, Mrs. LaChance came back to Connecticut with the defendant and they returned to Maine early the next morning. The defendant searched for and was successful in obtaining employment in Maine, and he and his companions remained in Maine at the witness' home for about two and one half to three weeks.

Prior to and during the above testimony, the defendant consistently objected to its admissibility and, following that testimony, moved to have it stricken from the record. The court overruled the objections to this line of inquiry and denied the defendant's subsequent motions to strike.

The defendant appears to claim that: the various portions of the testimony of LaChance regarding the defendant's presence in Maine and conduct subsequent to October 19, 1974, were irrelevant and inadmissible either on the grounds that it tended to establish a foundation for a charge on the defendant's flight from the state or that it constituted proof of the actions of the defendant immediately preceding and subsequent to the commission of the crimes in order to present a complete picture of the entire transaction; the testimony regarding the money spent by the defendant while in Maine was totally irrelevant under all the circumstances; and the testimony of the defendant's return to the state on October 22, 1974, should have been stricken when the state failed to establish that the witness' recollection of the precise date had been refreshed.

" 'The flight of the person accused of crime is a circumstance which, when considered together with

all the facts of the case, may justify an inference of the accused's guilt. It does not raise a presumption of guilt.' 1 Wharton [Criminal Evidence (13th Ed.)] § 143, p. 243; accord, 2 Wigmore, Evidence (3d Ed.) § 276; McCormick [Evidence (2d Ed.)] § 271 (c); see annot., 25 A.L.R. 886." *State* v. *Rosa,* 170 Conn. 417, 433, 365 A.2d 1135. Flight is a form of circumstantial evidence. Generally speaking, all that is required is that the evidence have relevance, and the fact that ambiguities or explanations may exist which tend to rebut an inference of guilt does not render evidence of flight inadmissible but simply constitutes a factor for the jury's consideration. *People* v. *Yazum,* 13 N.Y.2d 302, 304–305, 196 N.E.2d 263; 1 Wharton, op. cit. § 214; 29 Am. Jur. 2d, Evidence § 280.

Since it is unexplained flight which tends to prove a consciousness of guilt; *State* v. *Rosa,* supra, 432–33; *State* v. *Beaulieu,* 164 Conn. 620, 632, 325 A.2d 263; *State* v. *Miller,* 154 Conn. 622, 628, 228 A.2d 136; the probative value of evidence of flight is, in large part, dependent upon facts pointing to the motive which prompted it. See 29 Am. Jur. 2d, supra, § 280. As bearing upon the motive of the defendant, the state may present direct or inferential evidence of the defendant's knowledge he was wanted by the police; see *State* v. *Mayell,* 163 Conn. 419, 425, 311 A.2d 60; as well as, if relevant, evidence of the defendant's conduct and demeanor during his flight, the direction of his flight and the places to which he went. *Rollings* v. *State,* 160 Ala. 82, 49 So. 329; annot., 25 A.L.R. 886, 901; 29 Am. Jur. 2d, supra; 40 C.J.S., Homicide § 251. In the present case, we cannot say that the testimony involving the defendant's removal to Maine and general movements following the murders was irrelevant on the

question of flight. Although the trial court's admission of and subsequent refusal to strike this testimony was based upon other grounds, nevertheless, its decision is not subject to reversal.

As to the testimony regarding the expenditure of money by the defendant while in Maine, we do not agree with the defendant that, in light of all the other evidence, it should have been excluded as irrelevant. " 'One fact is relevant to another fact whenever, according to the common course of events, the existence of the one, taken alone or in connection with other facts, renders the existence of the other either certain or more probable. Unless excluded by some rule or principle of law, any fact may be proved which logically tends to aid the trier in the determination of the issue. . . . No precise and universal test of relevancy is furnished by the law, and the question must be determined in each case according to the teachings of reason and judicial experience.' " (Citations omitted.) *State* v. *Schaffer,* 168 Conn. 309, 317, 362 A.2d 893.

In view of the evidence from which the jury could have found that the defendant did not have enough money to pay for the shotgun he purchased two days before the murders; that, on the night following the crimes, the defendant and his companions were observed emptying the contents of some wallets; that the defendant was driven to a pond where he disposed of those wallets; and that the empty wallets of the victims were subsequently recovered from that pond by the police; there was no clear abuse of the trial court's broad discretion in allowing into evidence the testimony that the defendant paid at least part of a $50 to $70 bill in Maine on the night following the murders. See *State* v. *Schaffer,* supra. The facts that other testimony indicated that the

defendant denied having any money even after the murders and that he was owed money by another were factors affecting the weight to be accorded such testimony once the initial determination of relevancy was made by the court.

We do agree with the defendant, however, that the testimony of Mrs. LaChance regarding the date on which she returned to Connecticut with the defendant should have been stricken since, under questioning by defense counsel, the witness conceded that she had no present recollection of the date but, rather, was simply reading the date referred to in her written statement which was used by the state to refresh her recollection.[24]

Under the evidentiary rules of present recollection refreshed, the memorandum must stimulate the recollection of the witness "so that he may testify from a present recollection." *Neff* v. *Neff*, 96 Conn. 273, 278, 114 A. 126; *Card* v. *Foot*, 56 Conn. 369, 374, 15 A. 371; McCormick, Evidence (2d Ed.) § 9. Although the question whether the witness' recollection has been refreshed is a determination to be made by the trial court and is ordinarily not reviewable, where, as here, it is unmistakable that the witness simply read the memorandum without having any independent recollection of its reference to a

---

[24] "Q. I understand that. But what you remember today is not what you remember, but what you read in the statement; isn't that right?
A. Yes.

Q. So that your recollection is not really refreshed, all you are doing is reading it out of a statement; isn't that so?
A. Yes.

Q. So, once again I put it to you that you don't know whether you were here on Tuesday, or Wednesday, or Thursday, except what you said some period of time ago in a statement; isn't that right?
A. Right."

detail (here, the date), the conclusion of the trial court cannot be sustained. *State* v. *Perelli,* 125 Conn. 321, 327, 5 A.2d 705.

In order to constitute reversible error, however, the ruling must have been both erroneous and harmful. *Milton* v. *Wainwright,* 407 U.S. 371, 92 S. Ct. 2174, 33 L. Ed. 2d 1; *State* v. *Annunziato,* 169 Conn. 517, 524-25, 363 A.2d 1011. In view of the testimony of other witnesses that the defendant was in Connecticut on October 22, 1974, we find no basis to support the defendant's claim that the failure to strike this portion of Mrs. LaChance's testimony was probably harmful. See *State* v. *Vennard,* 159 Conn. 385, 393, 270 A.2d 837, cert. denied, 400 U.S. 1011, 91 S. Ct. 576, 27 L. Ed. 2d 625.

## XI

### ADMISSIBILITY OF MAPS AND TESTIMONY OF WOODWARD

From the evidence presented at trial, the jury could reasonably have found that on the night of October 19, 1974, the defendant was seen at about 7:45 to 7:50 p.m. at the home of Jeffrey and Clifford Chamberland located at 629 High Road in Kensington, and that the murders occurred sometime between 8:10 and 8:45 that night.

William Woodward, a Connecticut state policeman, testified for the state that, during the investigation following the murders, he was assigned to measure mileage and elapsed time between the High Road address and the murder scene, and that he in fact investigated two or three different routes between the two points. Over the objections of the defendant, the state was permitted to introduce into evidence Exhibits SSS and TTT, maps depicting the streets of Berlin and New Britain, respectively. Using the maps to illustrate his testi-

mony, Trooper Woodward explained and pointed out one route that he in fact measured. He testified that his odometer reading indicated that, when traveling that route, the distance between the two points measured 4.9 miles.

The admissibility of the maps and the admissibility of the above portions of Woodward's testimony constitute the defendant's next claims of error. In sum, the defendant argues that a proper foundation was not established by the state for the admission of the maps, and that the testimony of Woodward was irrelevant.

The state does not dispute the fact that the maps offered into evidence were not established to be fair and accurate representations of the areas depicted as they were on October 19, 1974, since it was established only that the exhibits were accurate representations as of December 31, 1974. Rather, the exhibits were admitted solely for the limited purpose of assisting the jury in understanding the testimony of Woodward. Such evidence, which is illustrative of a witness' testimony, is admissible in the discretion of the court even though it is not drawn to scale and is not entirely accurate in its portrayal of the locus. *Capone* v. *Sloan,* 149 Conn. 538, 543, 182 A.2d 414. In view of the limitation placed upon these exhibits, as explained to the jury,[25] the court did not abuse its discretion in allowing the maps into evidence for the purpose of aiding the

---

[25] "The Court: Exhibit SSS and Exhibit TTT are admitted for the limited purpose that they will be used to explain other testimony which the state intends to offer. If there is no other evidence, then I will entertain a motion to strike them. But they are not admitted because they represent accurately the situation as existed on October 19th, or for any other purpose, except that they will aid you in understanding the evidence. All right. And by 'you,' I mean the jury."

trier in understanding the evidence. *Zaist* v. *Olson,* 154 Conn. 563, 579, 227 A.2d 552; *Dawson* v. *Davis,* 125 Conn. 330, 332, 5 A.2d 703. Under the circumstances, "[t]he accuracy of the [maps] was a proper subject for cross-examination and the fact that . . . [they were] not . . . authenticated accurate map[s] of the locality, did not render [them] inadmissible but only affected [their] weight." *Hall* v. *Sera,* 112 Conn. 291, 295, 152 A. 148.

We similarly find no error in the admissibility of the testimony of Trooper Woodward. The witness' testimony that was admitted for the consideration of the jury was that he traveled one route between the High Road address and the bakery which, according to the reading he observed on his automobile odometer, measured 4.9 miles. Woodward did not record the mileage on any other route between the two points, and, on cross-examination, conceded that there are alternate routes which he did not attempt to measure.

"When an offer of evidence is challenged as irrelevant, the court must test the strength of the inference between the fact to be proved and the fact in issue. This question of relevancy must be determined according to reason and judicial experience." *Eason* v. *Williams,* 169 Conn. 589, 591, 363 A.2d 1090. The testimony of Woodward tended to show that the distance between the Chamberland residence and the murder scene was relatively short, and, inferentially, that it could possibly be traveled in a comparatively short period of time. The admission of this testimony did not, under all the circumstances, constitute an abuse of the trial court's broad discretion in determining the relevancy of evidence. See *State* v. *Carr,* 172 Conn. 458, 464, 374 A.2d 1107.

## XII

### Psychiatric Record and Testimony re Buck

In the course of the trial, Ralph Buck was called to testify as a witness for the state as to the contents of conversations which he allegedly had with the defendant while both were incarcerated at the Connecticut Correctional Institution at Somers.

Prior to the time when Buck was called as a witness, defense counsel informed the court that it had been confirmed that Buck had been incarcerated at the Security Treatment Center in Norwich from May of 1973 until August, 1973. Upon the basis of that representation, and without objection by the state, the court granted the defendant's motion that the prospective witness be ordered to submit to a psychiatric examination by Dr. Robert C. Doherty to determine his competency in connection with his testimony. Subsequently, defense counsel further informed the court that a subpoena previously issued for the production of Buck's psychiatric records had been complied with by the Whiting Forensic Institute and that it was understood that Buck had no objection to Dr. Doherty's examining those records although he did object to the examination of them by defense counsel.

On December 5, 1975, Dr. Doherty was called as a witness by the defense and testified, in the absence of the jury, in part, as follows: He was a psychiatrist and he performed a psychiatric examination on Ralph Buck at his office on December 4, 1975; he took a history and reviewed available psychiatric information from the Security Treatment Center and he performed a present-day mental status test; he had reviewed Whiting Forensic Institute records and concluded that Buck did not suffer from any

mental disease process which would make him incapable of presenting testimony as a witness; it was his opinion that Buck's mental status would have been the same on July 28, 1975, and that there would have been no change between then and December 4, 1975; Buck presented no evidence of a psychosis or neurosis; at the Security Treatment Center, Buck was labeled an antisocial character, which was consistent with his past criminal record and his past drug usage; an antisocial personality is one whose behavior patterns bring him into repeated conflict with society; the condition has no relationship to the ability of the individual to tell the truth; and Buck was capable of understanding the nature and obligations of the oath.

Thereafter, in the jury's absence, Buck testified as to an admission allegedly made to him by the defendant while at Somers, his contacting of the police regarding this information, and the instructions thereafter given to him by the police following his disclosure of these matters. During cross-examination, still in the absence of the jury, defense counsel requested the court to rule on his motion for permission to inspect Buck's psychiatric records. After a discussion with counsel appointed by the court to confer with the witness, Buck indicated that he had no objection to having the record of his psychiatric treatment exposed to defense counsel or to any other person or persons involved in the case. Thereupon, the record from the Security Treatment Center was marked for identification and defense counsel was granted permission to inspect it.

Subsequently, defense counsel offered the psychiatric record as a full exhibit; at that time, however, the court sustained the state's objection to its admissibility. Preliminary cross-examination of

Buck continued in the absence of the jury during which he was questioned, inter alia, regarding his history of treatment at two psychiatric institutions.[26]

Due to some confusion over the extent of Buck's waiver of any objections he may have had to the disclosure of his psychiatric records, he was again briefly questioned on this matter in the jury's absence, at which point he expressed his desire to consult with his appointed counsel. With the permission of the court, Buck's counsel explained that his client "completely objects to any disclosure directly or indirectly of this report, any reference to it, or even anything in connection with the report or any information showing that such a report exists, to any member of the public, to the jury, or to anyone other than the Court, [the prosecuting attorneys and the defense attorney]." [27]

In response to the defendant's claim that the witness should not be permitted to testify if cross-examination were not allowed regarding his psychiatric records, the court concluded that, "in the interests of fundamental fairness," the defendant would be permitted to cross-examine Buck with respect to the record. Thereupon, after informing the court that Buck's treating psychiatrist, Dr. Claude Ballard, was dead, the defendant again offered the psychiatric record as a full exhibit under §§ 52-174 and 4-104 of the General Statutes. The

---

[26] A reading of the transcript indicates that the preliminary examination of Buck in the absence of the jury was apparently both for the purpose of establishing his competency as well as for the purpose of determining whether he should be treated as an "agent" of the police insofar as some of his conversations with the defendant were concerned.

[27] Through his attorney, Buck also indicated that, if it were necessary, he would withdraw the consent previously given.

state's objection to the admission of the record was again sustained, and Buck was called to testify in the presence of the jury.

On direct examination before the jury, Buck testified, in part, as follows: He met the defendant while at Somers and had a conversation with the defendant regarding the bakery murders within the first nine days of July, 1975; the defendant stated that he was there and that he did it, but no one could put him there; the defendant stated he was supposed to be waiting outside while the other individual was inside, but he had to go in to help his partner when an argument or fight developed inside; the defendant said he fired the shotgun and the other individual fired the 9 mm. pistol; the defendant said they were about to leave and four people had been killed, and two more people came in, which made a total of six; the defendant stated that the proprietor of the bakery was involved in bookmaking and was supposed to have a large sum of money; and that Buck wrote a letter to the state police on or about July 21.

On cross-examination, Buck testified as to his anticipated parole possibilities and his criminal record; that he had spent fifteen of his thirty years in prisons or institutions; and that his confinement in the prison's segregation unit was voluntary, partly because his brother-in-law was a policeman and partly because certain people thought he (Buck) was an informer. Thereupon, defense counsel conducted an extensive examination of Buck regarding his mental history and the contents of the psychiatric record. Buck testified that at some time appreciably before his most recent hospitalization at Whiting Forensic Institute, he was sent to Newton State Hospital for observation; that, at his request, he

was transferred by prison authorities to Whiting on May 7, 1973, where he remained for approximately ninety days; and that upon his return to prison, he received psychotherapy for a few months.

Buck further testified that he told the psychiatrist at Whiting that he had talked to another psychiatrist when he was eleven years old. Buck explained that: it was his understanding he had an antisocial personality; the fact that he was "manipulative" was discussed at the hospital; and he had, for a short time, used amphetamines. He denied, however, that he had made a suicidal attempt; that he was paranoid or had delusional problems; that he had persecutory thoughts; that he exhibited assaultive behavior, autistic thinking, signs of grandiosity, or poor judgment; or that he was diagnosed as a chronic liar or as having other mental disorders.

Following Buck's testimony, the defense called a psychiatric social worker, Nancy Kraft, and a psychologist, Raymond Irizarry, who admittedly had some professional contact with Buck while at Whiting Forensic Institute. During the course of and following the direct examination of both these witnesses, the defendant again attempted to introduce the psychiatric record of Buck pursuant to General Statutes §§ 4-104, 52-174 and 52-180, and under the authority of *Taborsky* v. *State,* 142 Conn. 619, 116 A.2d 433. The court, stating that the defendant had not established any basis for admitting this evidence, again sustained the state's objection to its admissibility. In addition, the court consistently sustained the state's objections to the testimony of Kraft and Irizarry relating to their contact with him at Whiting on the grounds of relevancy in that it involved inquiry into collateral issues.

The defendant claims on appeal that the court erred in refusing to admit into evidence the psychiatric record and testimony offered to impeach the credibility of Buck. According to the defendant, those actions of the court denied the defendant his rights of confrontation and cross-examination and amounted to a denial of due process of law.

As noted above, the defendant offered Buck's psychiatric record into evidence on a number of occasions citing a variety of grounds for its admissibility. An examination of the pertinent portions of the transcript, however, reveals that a consistent objection of the state to the admissibility of this record and to the testimony of Kraft and Irizarry relating to its contents, which was cited by the court as a reason for sustaining the objections, was that the record and testimony in question were inadmissible on the grounds of their irrelevancy and collateral nature. Since we conclude that the exclusion of the record on that ground did not constitute reversible error, we need not consider whether the record would otherwise have been admissible under the statutory provisions relied upon by the defendant. See *Kelly* v. *Sheehan,* 158 Conn. 281, 259 A.2d 605.

Defense counsel made it clear that Buck's psychiatric record was not offered to show prior inconsistent statements by him but, rather, for the purpose of presenting to the jury the psychiatric record of the witness to impeach his credibility. Relying upon cases such as *Taborsky* v. *State,* supra; *Holcomb* v. *Holcomb,* 28 Conn. 177; and *United States* v. *Guillette,* 404 F. Sup. 1360 (D. Conn.); the defendant claims an absolute right to the admissibility of such evidence.

As we have previously noted in another context, in *Taborsky* v. *State,* supra, a new trial was ordered for the defendant on the basis of newly discovered evidence as to the "undoubted and incurable insanity" of a crucial state's witness. In that case, evidence of the witness' mental disease was, at the time of trial, neither available to the court as a factor to consider in determining his competency to testify nor presented to the jury for their use in assessing his credibility. Id., 629–30. In ordering a new trial for the defendant in the *Taborsky* case, this court noted that the evidence of the witness' mental condition shortly before, at and after the occurrence to which he testified, and at the time of trial, "goes to the very sanity of the key witness, without whose evidence the accused could not have been convicted." Id., 632. Similarly, in *Holcomb* v. *Holcomb,* supra, this court found error in the exclusion of all evidence as to the insanity of the sole eyewitness before and after the transaction to which he testified, which evidence was offered to impeach the credibility of that witness. And, in *United States* v. *Guillette,* supra, the District Court ordered a new trial on due process grounds where a crucial government witness deliberately falsely denied any past psychiatric examination, evaluation or treatment and the government negligently failed to disclose to the defense information in the witness' military records, which were in the government's possession, relating to his past psychiatric history. Id., 1370–72.

In the present case, there can be no doubt that Buck's testimony as to the defendant's alleged admission of his participation in the murders was extremely incriminating. Nevertheless, it is important to note that, as appears from a reading of

other portions of this opinion, there was substantial testimony and evidence linking the defendant to the crimes, including testimony of a witness indicating that she saw the defendant present inside the bakery at about 8:25 p.m. on the night of the murders. (See Part XIII, infra.)

Moreover, this is not a case like *Taborsky* v. *State,* supra, or *United States* v. *Guillette,* supra, where the trier of fact is completely deprived of any evidence of a crucial witness' past mental problems. The defendant in the present case was afforded wide latitude in his cross-examination of Buck regarding his past mental history and treatment. In fact, Buck's psychiatric record was used by defense counsel to refresh the recollection of the witness when he stated that he could not remember whether he was ever diagnosed as a chronic liar or whether he had ever told his treating psychiatrist that he had attempted suicide or that he had experienced persecutorial thinking after a "bad trip" with amphetamines. As noted earlier, the jury were generally made aware of Buck's past psychiatric treatment and of specific problems relating to his mental health.

While we agree with the defendant that psychiatric records and testimony may be admissible in order to impeach the credibility of a witness; *Taborsky* v. *State,* supra; we cannot agree that the admission of such evidence is an absolute right without limitation. As a general rule, psychiatric evidence and testimony as to the mental unsoundness of a witness (i.e., relating to a trait importing in itself a defective power of observation, recollection or communication), at or around the time of the trial or of the occurrence about which he is to testify, are admissible to impeach the credibility of a wit-

ness. See *Taborsky* v. *State,* supra; 3A Wigmore, Evidence (Chadbourn Rev.) § 931; annot., 20 A.L.R.3d 684, § 18; 81 Am. Jur. 2d, Evidence, § 540. Nevertheless, the admission of such evidence must be left to the discretion of the trial court which is better able to assess the probative value of such evidence as it relates to the particular case before it. *United States* v. *Demma,* 523 F.2d 981, 986–87 (9th Cir.); *United States* v. *Barnard,* 490 F.2d 907, 912–13 (9th Cir.); *Peckham* v. *United States,* 210 F.2d 693, 698 (D.C. Cir.); *People* v. *Spano,* 57 App. Div. 2d 715, 395 N.Y.S.2d 548; *State* v. *Pinkus,* 550 S.W.2d 829, 839–40 (Mo. App.); McCormick, Evidence (2d Ed.) § 45; see 2 Wigmore, op. cit., § 233 (3).

In the present case, the record does not reveal that the details of Buck's hospitalization, treatment and diagnosis more than two years before the incidents to which he testified and nearly two and one half years before his testimony at trial affected his powers of observation, recollection or communication so as to have probative value on the question of his credibility.[28] Moreover, the record, which was available to the defense, prosecution and the trial court for their inspection contained matters which related to Buck's psychological make-up from the time he was twelve years of age, and earlier.

---

[28] As noted earlier, Dr. Robert Doherty, a psychiatrist appointed by the court to undertake a mental examination of Buck for the purpose of determining his *competency,* testified outside the jury's presence that an examination of Buck, including a review of his psychiatric record at Whiting Forensic Institute, led him to conclude that, at the time of the examination, Buck did not suffer from any mental disease process or present evidence of a psychosis or neurosis. According to Doherty, the fact that the witness was labeled an antisocial character did not, in his opinion, have any relationship to the ability of the individual to tell the truth.

In sum, on the basis of the evidence before the trial court, the extensive cross-examination of Buck regarding his past psychiatric history, and our own review of the contents of the record in question, which was marked as an exhibit for identification, we cannot conclude that the trial court's refusal to allow the record into evidence constituted such a clear abuse of discretion so as to warrant reversal.

What has been said above applies equally to the restriction of the defendant's examination of both Kraft and Irizarry. The scope of examination of an impeachment witness is likewise within the discretion of the trial court, which must take into account the probative value of the proffered testimony. See *State* v. *Stamm,* 16 Wash. App. 603, 604–605, 559 P.2d 1. In the absence of a clear abuse of discretion, the trial court's determination of relevancy will not be disturbed. *State* v. *Schaffer,* 168 Conn. 309, 317, 362 A.2d 893.

In view of the defendant's access to the psychiatric record of Buck and the virtually unrestricted cross-examination of the witness regarding those matters, it cannot be said that the defendant was either deprived of his rights to cross-examine and confront the witness or denied due process of law. See *Davis* v. *Alaska,* 415 U.S. 308, 94 S. Ct. 1105, 39 L. Ed. 2d 347; cf. *State* v. *Corley,* 177 Conn. 243, 246, 413 A.2d 826. The jury in the present case were adequately apprised of the relevant factors in Buck's background to enable them, as the sole triers of fact and credibility, to make a sound judgment as to the reliability of the witness.

## XIII

### In-Court Identification

Nancy Pizzoferrato, a witness for the state, made an in-court identification of the defendant as being the man she saw in the bakery at about 8:25 p.m. on the night of October 19, 1974. The defendant has claimed error in the trial court's denial of his motion to suppress that in-court identification.

From the preliminary testimony outside the presence of the jury, the trial court, as factfinder, could have found the following to have been among the facts established. At 8:25 p.m. on the night of October 19, 1974, Mrs. Pizzoferrato was a passenger in an automobile traveling 25 miles per hour in front of the bakery on the opposite side of the street. Since she intended to stop there and make a purchase, Mrs. Pizzoferrato looked through the back seat side window on the driver's side of the vehicle and into the door of the bakery. She recognized a store clerk behind the counter in the bakery whom she knew as Helen — Helen Giansanti was one of the victims found at the scene by the police. Mrs. Pizzoferrato also observed a man standing on the other side of the counter whom she described as a large man at least six feet two inches tall, with a black mustache, a black beard and black hair, and wearing a bandanna tied around his forehead which appeared to be blue in color with what seemed to be gold or yellow markings on it.[29] The witness did not stop at the bakery but proceeded to her house which was on the same street as the bakery about two-tenths of a mile away.

---

[29] Mrs. Pizzoferrato also observed the sleeve of another person inside the bakery at the time.

Three days after the murders, Mrs. Pizzoferrato called the New Britain police "Info-Line" after becoming aware of the existence of a phone number to call for information regarding the murders. In that phone conversation, the witness explained that the killings must have occurred after 8:15 p.m. since she saw people in the bakery at 8:25 p.m., and that she saw in the bakery a tall man with dark hair, a moustache and a beard, who was wearing a bandanna which appeared to be blue in color with yellow or gold marks on it. Mrs. Pizzoferrato did not identify herself in the course of that phone call.

Sometime later, Mrs. Pizzoferrato had her mother transferred to the hospital by police car and told the officers about the man she had seen in the bakery and gave the same description as noted above. The witness was unsure as to the date of that conversation.

On January 25, 1975, two policemen came to the home of Mrs. Pizzoferrato during the course of a neighborhood canvass and not in response to any previous communication with the witness. After her conversation with those officers, the witness was transported to the police station where she gave a statement and, from a display of six photographs, selected a picture of the defendant as the man she saw in the bakery on the night of the murders.

The trial court granted the defendant's motion to suppress evidence as to that out-of-court photographic identification on the ground that the identification was unnecessarily suggestive. The basis upon which the court rested its decision as to the exclusion of that evidence was that the photograph identified by the witness at the police station was

the same one which appeared in the New Britain Herald on November 21, 1974, and which was seen by Mrs. Pizzoferrato.

Thereupon, the court heard additional evidence, outside the jury's presence, with respect to the defendant's motion to suppress an in-court identification. The denial of that motion is the basis for the defendant's present claim of error.

The appropriate legal standard to be applied in this case is well established. In *Simmons* v. *United States,* 390 U.S. 377, 88 S. Ct. 967, 19 L. Ed. 2d 1247, the Supreme Court held (p. 384) that "convictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." In considering each case on its own facts, therefore, " '[t]he required inquiry is two-pronged: first, whether the identification procedure was impermissibly suggestive; and second, if it is found to have been so, whether the procedure had such a tendency to give rise to substantial likelihood of irreparable misidentification that the in-court identification must be excluded.' *United States ex rel. Bisordi* v. *LaVallee,* 461 F.2d 1020, 1023 (2d Cir.)." *State* v. *Smith,* 165 Conn. 680, 684, 345 A.2d 41.

In the present case, the trial court concluded that the out-of-court photographic identification of the defendant was impermissibly suggestive. Despite that fact, the witness could be allowed to make an in-court identification "if it is purged of the taint of the defective pretrial procedure by establishment of the fact that it is based upon dis-

associated and independent observation. See *United States* v. *Wade,* 388 U.S. 218, 241, 87 S. Ct. 1926, 18 L. Ed. 2d 1149." *State* v. *Smith,* supra, 685. " 'The effort must be to determine whether, before the imprint arising from the unlawful identification procedure, there was already such a definite image in the witness' mind that he is able to rely on it at trial without much, if any, assistance from its successor.' " Id.

As the United States Supreme Court has recently noted, reliability is the "linchpin" in determining the admissibility of both pretrial and in-court identifications. *Manson* v. *Brathwaite,* 432 U.S. 98, 106–107 n. 9, 114, 97 S. Ct. 2243, 53 L. Ed. 2d 140. "The standard, after all, is that of fairness"; Id., 113; and that must be determined by the totality of the circumstances as emphasized in both *Stovall* v. *Denno,* 388 U.S. 293, 87 S. Ct. 1967, 18 L. Ed. 2d 1199, and *Neil* v. *Biggers,* 409 U.S. 188, 93 S. Ct. 375, 34 L. Ed. 2d 401. The factors to be considered in determining the reliability of an identification "include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation. Against these factors is to be weighed the corrupting effect of the suggestive identification itself." *Manson* v. *Brathwaite,* supra, 114 (citing *Neil* v. *Biggers,* supra, 199–200).

Turning to the facts of this case, we note initially that, in terms of time, Mrs. Pizzoferrato's opportunity to view the man in the bakery existed only for a matter of seconds, and in terms of distance, she was in an automobile on the far side of the

street in front of the bakery. The witness was, however, looking from darkness through an unobstructed glass door of a lighted bakery on a clear night. She was familiar with the area in general and the bakery in particular since she lived on the same street only two-tenths of a mile away and traveled the road on almost a daily basis. Since she was a passenger in the vehicle, she was not obliged to concern herself with its operation but could direct all of her attention to her view of the store.

Mrs. Pizzoferrato's intention to stop and make a purchase at the bakery was the reason why she looked into the store at the time she did. Although her attention was not focused on the bakery because she observed anything unusual taking place, the witness' recognition of a store clerk inside was evidence that her degree of attention was more than minimal.

Probably most significantly, the witness' prior descriptions of the defendant were extremely accurate. Mrs. Pizzoferrato's testimony, which the court was entitled to credit, revealed that she called the local police three days after the murders and told them that at 8:25 p.m. on October 19, 1974, she saw in the bakery a big, tall man with dark hair, a moustache and a beard wearing on his head a dark bandanna that appeared to be blue with gold or yellow markings on it. Similarly, there was evidence before the court that, on January 25, 1975, the witness gave the police the same description noted above before her view of the photographs at the police station. Although the defendant points to alleged inconsistencies in the witness' detailed description of the length and fullness of the hair

and the size of the beard on the man whom she saw on the night in question, there is no claim that the "prior descriptions" noted above were inaccurate.

And finally, in the witness' pretrial photographic identification of the defendant a little more than three months after the crime, and in her in-court identification of the defendant, she was certain that the defendant was the man she had seen on the night in question.

In addition to a consideration of the indicia of reliability noted above, the court in the present case was bound to determine whether the in-court identification was "purged of the taint of the defective pretrial procedure by establishment of the fact that it is based upon disassociated and independent observation." *State* v. *Smith,* supra, 685. Evidence before the court indicated that Mrs. Pizzoferrato was able to describe the man seen in the bakery three days after the crime, which was before his picture appeared in a newspaper and prior to her identification of his photograph. A factor considered significant by the trial court, in this regard, was the witness' description of the bandanna at that time, which was prior to the date the police first learned of and recovered a bandanna which matched her description. As noted previously (Part VIII, supra), testimony was received earlier in the trial relating to the defendant's actions wrapping wallets and a pistol in a bandanna and throwing it in a body of water on the night of the murders.

The witness unequivocally stated that she was able to make an in-court identification of the defendant solely from her observations on the night in

question[30] and consistently denied any suggestion that her view of the photographs had any effect whatever on her present ability to identify the defendant.

Under all the circumstances of this case, we cannot say that the trial court erred in concluding that the state had met its burden of establishing that the in-court identification of the defendant was based upon disassociated observation independent of the defective pretrial procedure. The pretrial photographic identification procedure did not have such a tendency to give rise to a substantial likelihood of irreparable misidentification that the in-court identification had to be excluded. *State* v. *Smith,* supra, 684. "Short of that point, such evidence is for the jury to weigh. We are content to rely upon the good sense and judgment of American juries, for evidence with some element of untrustworthiness is customary grist for the jury mill. Juries are not so susceptible that they cannot measure intelligently the weight of identification testimony that has some questionable feature." *Manson* v. *Brathwaite,* supra, 116.

---

[30] To the following question by the state, the witness responded with an unqualified "Yes":

"Mrs. Pizzoferrato, the question I am going to ask is reasonably technical, so I ask, please, that you listen carefully and think before you answer. The question is this: I want you to think about what you saw, what you say you saw at the Donna Lee Bakery about 8:25 p.m. on the 19th of October, 1974. I want you to think specifically about the man that you saw in there, and I want you not to think about anything that has transpired between now and then. I want you specifically not to think about any picture you may have seen in the newspaper, and I want you specifically not to think about any photographs you may have seen at the New Britain police station on the 25th of January, '75, nor to think about any discussions you may have had from that time until now, and to tell me then, based only on what you saw on the 19th of October, '74, whether or not you are able to identify in court the person, the man you saw in the bakery on the 19th of October, '74?"

In this regard, we note that "[t]he danger of [the defendant's] conviction being based on misidentification resulting from the [photographic identification] was considerably reduced by exhaustive cross-examination which exposed to the jury the potential for error. See *Simmons* v. *United States,* supra [384]." *United States ex rel. Bisordi* v. *LaVallee,* supra, 1026; *United States ex rel. Pella* v. *Reid,* 527 F.2d 380, 385 (2d Cir.).

## XIV

### Remaining Claims

### A

### Charge to the Jury

The defendant contends that the trial court committed reversible error in five separate portions of its charge to the jury.

" 'The test to be applied to any part of a charge is whether the charge considered as a whole presents the case to the jury so that no injustice will result.' *State* v. *Mullings,* 166 Conn. 268, 275, 348 A.2d 645; *Siladi* v. *McNamara,* 164 Conn. 510, 515, 325 A.2d 277. It is well established that individual instructions are not to be judged in artificial isolation from the overall charge. *State* v. *Crawford,* 172 Conn. 65, 69, 372 A.2d 154; *State* v. *Ralls,* 167 Conn. 408, 422, 356 A.2d 147." *State* v. *Roy,* 173 Conn. 35, 40, 376 A.2d 391; see also *Cupp* v. *Naughten,* 414 U.S. 141, 94 S. Ct. 396, 38 L. Ed. 2d 368. "The issue then is whether the charge taken as a whole was correct in law and sufficient for the instruction of the jury." *State* v. *Moye,* 177 Conn. 487, 490–91, 418 A.2d 870.

The portion of the charge relating to the concept of reasonable doubt was, taken as a whole, proper

and sufficient for the guidance of the jury. See *State v. Bzdyra,* 165 Conn. 400, 406, 334 A.2d 917; *State v. Thomas,* 105 Conn. 757, 759, 136 A. 475. Similarly, the court's overall charge relating to the credibility of witnesses was proper, and it is not reasonably probable that the jury were misled by an error, if any, in that portion dealing with the effect of prior inconsistent statements. *State v. Rose,* 169 Conn. 683, 687–88, 363 A.2d 1077. Nor is it reasonably probable that the jury were misled as a result of the court's reference to the defendant "acting alone or with another" in its charge on felony-murder in spite of the fact that the indictment did not accuse the defendant of acting alone. The indictment, which charged only that the defendant was "acting with one or more persons," was read to the jury by the trial court and went to the jury for their use during their deliberations.

The defendant contends that his privilege against self-incrimination and right to due process were violated by the trial court's indirect comment upon his failure to testify when, in the course of the portion of the charge relating to intent, the court stated that intent ordinarily must be determined from circumstantial evidence "aside from that person's own testimony." For the same reasons that we rejected this precise claim in *State v. Castagna,* 170 Conn. 80, 91–92, 364 A.2d 200, we find no merit to the defendant's argument in the present case. Similarly, the court's charge that flight, *when unexplained,* tends to prove a consciousness of guilt was correct in law and did not amount to either a violation of the defendant's privilege against self-incrimination or a

violation of his right to the presumption of innocence. See *Barnes* v. *United States,* 412 U.S. 837, 93 S. Ct. 2357, 37 L. Ed. 2d 380. In any event, where the charge is considered as a whole, it is not reasonably possible that the jury were misled as to the state's burden of proof in this case.

## B

### Motion to Set Aside Verdict

Four of the five grounds upon which the defendant claims error in the trial court's denial of his motion to set aside the verdict can be disposed of by reference to our discussion of those issues in Parts I, III, VIII and XIII of this opinion.

The defendant's remaining claim is that the verdict should have been set aside due to the failure of the state to arraign him and thus provide the defendant with the opportunity to exercise his rights to plead guilty or elect to be tried by the court. Whatever merit such a claim may have in the abstract is irrelevant in the present case, however, since the record fails to indicate, and the defendant does not assert, that he ever sought to plead guilty or expressed a desire to waive his right to a trial by jury any time prior to the rendition of the jury verdict in this case.

There is no error.

In this opinion the other judges concurred.