STATE OF CONNECTICUT *v.* KEITH J. FULLER
(AC 15737)

Foti, Landau and Spear, Js.

Argued January 20—officially released April 7, 1998

*Norman A. Pattis*, for the appellant (defendant).

*Eileen McCarthy Geel*, deputy assistant state's attorney, with whom, on the brief, were *Michael Dearington*, state's attorney, and *Christopher Alexy*, assistant state's attorney, for the appellee (state).

*Opinion*

FOTI, J. The defendant appeals from the judgment of conviction, rendered after a jury trial, of two counts of larceny in the second degree in violation of General Statutes § 53a-123, four counts of robbery in the third degree in violation of General Statutes § 53a-136, two

counts of larceny in the third degree in violation of General Statutes § 53a-124, and one count of assault of a victim sixty years of age or older in violation of General Statutes § 53a-61a.[1] The defendant claims that he is entitled to a new trial on all charges because the trial court improperly admitted evidence of his escape from custody, thereby violating his right to due process.[2] The defendant also claims that he is entitled to a judgment of acquittal on one count of larceny in the second degree because the evidence was insufficient to sustain that conviction. We affirm the judgment of the trial court.

From the evidence presented at trial and reasonable inferences drawn therefrom, the jury reasonably could have found the following facts. On May 4, 1992, at about 9:30 p.m., as Annluise Coombs was placing her purse and other items in the backseat of her car, the defendant came up behind her and told her not to scream and to give him her pocketbook. Following a brief struggle, the defendant took Coombs' purse, which contained her wallet, driver's license, credit cards, checkbooks and eyeglasses. On May 12, 1992, Coombs was shown a black and white photographic array that included a six year old photograph of the defendant. Coombs was unable to identify her attacker from any of the photographs. On June 18, 1992, she was shown a color photographic array that included a photograph of the defendant that was taken subsequent to his June 8,

[1] The defendant was charged with numerous counts arising out of six incidents in New Haven on five separate dates in May and June of 1992. The defendant consented to a consolidation of all matters for trial. At the close of evidence and before jury deliberations, the state filed a twelve count substitute information. The defendant was acquitted of one count each of robbery in the third degree, larceny in the third degree and assault of a victim sixty years of age or older. The defendant also was acquitted of one count of risk of injury to a child in violation of General Statutes § 53-21, brought pursuant to a separate information.

[2] On appeal, the defendant does not claim that the trial court abused its discretion in admitting this evidence.

1992 arrest for unrelated matters. Coombs selected the defendant as her attacker, and signed and dated the photograph. Coombs also made an in-court identification of the defendant as her assailant.

Later in the evening of May 4, 1992, the defendant and a female companion took a taxicab ride that lasted over an hour and included several stops at grocery stores and gasoline stations. The defendant and his companion told the cab driver, William Baysah, that they were trying to buy cigarettes with a credit card. Toward the end of the cab ride, the defendant purchased $10 worth of gas with a credit card that belonged to Coombs. At the end of the cab ride, the defendant's companion paid Baysah with a check from Coombs' checkbook and used Coombs' driver's license as identification. On June 18, 1992, Baysah selected the defendant's picture from a photographic array and identified him as the male passenger. He also made an in-court identification of the defendant.

On May 9, 1992, Lawrence Agostini, who was sixty-one years old at the time, parked his car in St. Bernard's Cemetery on Ella Grasso Boulevard in New Haven. When he returned to his bronze colored, four wheel drive 1985 AMC Eagle station wagon, he noticed the defendant and another black male walking toward him. As Agostini prepared to enter the car, the defendant approached him and demanded his wallet and keys. When the defendant found the keys to the car on the driver's seat, Agostini tried to stop him from taking the car. The defendant punched Agostini in the left temple. Agostini fell to the ground and the defendant drove away in Agostini's car. On June 15, 1992, Agostini selected a picture of the defendant from a ten picture photographic array and stated that, while he was not 100 percent certain of the identification, the photograph was of a man who strongly resembled his attacker.

On May 16, 1992, at about 3:30 p.m., Linda Proto was driving from West Haven into New Haven along Forest Road. Proto's five year old daughter was with her in the front passenger seat of her 1988 Oldsmobile Cutlass Cierra. As she was driving, she noticed that her car was being tailgated by a small bronze colored American car with three black men in it. The car accelerated when she did and followed her through a series of turns. Proto watched the driver in her rearview mirror. The bronze car bumped the rear bumper of Proto's car shortly after she pulled onto Lawncrest Avenue in New Haven. Proto pulled to the side of the road and did not get out of the car. The defendant, who was driving the car behind her, got out of that car and approached Proto's car. The defendant, who was wearing a baseball cap, came to Proto's window and told her to get out to view the damage. As she got out of the car, she turned to face the defendant and saw his face. The defendant then punched her. The next thing Proto could recall was being in the street on her hands and knees and seeing the defendant sitting in the driver's seat of her car. Proto screamed, "Let my baby go. Don't take her." As Proto continued to scream and run toward her car, the defendant yelled at her daughter to get out of the car. Proto's daughter unbuckled her seat belt and opened the car door. Once the child was out of the car, the defendant drove away in Proto's car and his accomplices drove away in the other car. The defendant took clothing, Proto's purse, which contained approximately $60, and her daughter's coat. At about midnight on May 16, 1992, Proto received a call from the police reporting that her car had been found. When Proto went to pick up her car at the police garage, it was parked next to a small bronze colored American car.

On May 29, 1992, Proto viewed eight pictures in a black and white photographic array that contained a six or seven year old picture of the defendant. Proto

selected the picture of the defendant from the array and told Dennis Kelly, a New Haven police detective, that the man in the photograph looked similar to her attacker. Because Proto was somewhat unsure of her identification, Kelly brought her to the New Haven Superior Court on June 9, 1992, to view an arraignment of about twenty people. Proto saw the defendant at the arraignment and immediately recognized him as her assailant. When the defendant looked over at Proto, he tried to hide his face from her. After leaving the courtroom, Proto confirmed to Kelly that the defendant was her assailant and carjacker. Proto identified the defendant again at trial.

On May 20, 1992, at about 1:15 p.m., the defendant approached Henry Rathgeber, then eighty-two years old, as Rathgeber was getting out of his 1985 Volvo station wagon in the parking lot of the Westville branch of the New Haven Public Library. The defendant told Rathgeber that he needed money for a ride to Bridgeport. When Rathgeber refused to give him money, the defendant told Rathgeber to give him his wallet and money or he would be shot. Rathgeber hit the defendant in the back of the neck and opened the car door into him. While the defendant was bending over, recovering from the blow, Rathgeber ran away toward the street. The defendant caught up to Rathgeber about thirty feet from his car, tackled him and took his wallet from his pocket. The defendant then demanded Rathgeber's car keys. Rathgeber again resisted, but the defendant pried the keys from Rathgeber's fist. The defendant then drove away in Rathgeber's car. This incident was witnessed by Eliyahu Katz. On June 12, 1992, Katz was shown a ten picture color photographic array from which he selected the defendant's picture as being of Rathgeber's assailant. In addition to the details given by Rathgeber, Katz recalled that the defendant wore a blue baseball cap that fell off at the time of the attack.

On June 1, 1992, at about 11 p.m., Joan Paganelli, a licensed practical nurse at Windsor Castle Health Care Center on Ella Grasso Boulevard in New Haven, went to her car in the health facility's well lit parking lot. As she opened the door of her 1975 Chevrolet Impala, the defendant came up to her, pulled her out of the car and said, "Give me your keys, bitch." Paganelli immediately left the car with her purse in it and returned to the health care facility. The police called Paganelli about two days later and informed her that her car had been found with a flat tire not far from where it was stolen. On June 15, 1992, Kelly showed Paganelli a color photographic array from which she selected the defendant's picture. Paganelli signed and dated the photograph she had selected. Paganelli also identified the defendant at trial as the person who had stolen her car.

On June 8, 1992, the defendant was arrested for robbery and larceny following an incident unrelated to those previously mentioned. Because of the similarities between the crimes for which the defendant was arrested on June 8, 1992, and several other recent robberies and larcenies, Joseph Howard, a New Haven police detective and sergeant questioned the defendant about fifteen cases in an interview room at the police department. At times during the interview, Howard was alone with the defendant, while at other times, detectives also were present in the interview room. The defendant was advised of his rights and voluntarily waived them.

During his interview with Howard, the defendant, who had known Howard for about ten years, admitted his involvement in the May 9, 1992 robbery of Agostini's 1985 AMC Eagle station wagon at St. Bernard's Cemetery. The defendant also admitted that on May 16, 1992, he was driving the car that rear-ended Proto's car, which he then stole. When Howard reminded the defendant that Proto's five year old daughter was in the front

passenger seat for a short time, the defendant would not say anything more about the case.

When questioned about the Rathgeber robbery and assault, the defendant recalled stealing a 1985 Volvo station wagon from the victim and the location where he had abandoned the car. On further questioning, the defendant admitted that on June 1, 1992, he had stolen a 1975 Chevrolet Impala at the Windsor Castle Health Care Center. The defendant said that he had driven the car only a short distance when a tire had gone flat. The defendant denied any involvement in the theft from Coombs, as well as the remainder of the fifteen cases.

## I

The defendant claims that the trial court improperly allowed the jury to hear evidence of his August 28, 1992 escape from custody for purposes of demonstrating his possible consciousness of guilt.

The facts relevant to this claim may be summarized as follows. On August 28, 1992, at about 3:30 p.m., Special Deputy Patrick Egan and other members of the New Haven sheriff's department were transporting prisoners from the New Haven courthouse. As the prisoners were boarding the transport van, the defendant and another prisoner broke free and ran. Egan ran after the defendant, chasing him for several blocks before catching up with him. The defendant later was returned to the Whalley Avenue correctional center.

In its instructions to the jury, the trial court stated: "The flight of a person accused of a crime is a circumstance which, when considered with all the facts, may justify an inference of the accused's guilt. Flight, however, if shown, is not conclusive. It's circumstantial evidence, and you may or may not infer consciousness

of guilt from it. It is to be given the weight to which you think it is entitled under the circumstances."

The defendant argues that the state made no effort to inform the jury of the crimes for which he was in custody when he attempted to escape. The defendant further argues that to introduce evidence of his attempted escape to support an inference of guilt, the state must show that he was fleeing from the "crime charged." The defendant also argues that the jury reasonably could have inferred that his attempted escape demonstrated a consciousness of guilt of the unrelated crimes for which he was being held, rather than of the crimes for which he was tried in this matter. We do not agree.

Evidence of flight or escape is admissible to show consciousness of guilt. *State* v. *Burak*, 201 Conn. 517, 532–33, 518 A.2d 639 (1986). The probative value of such evidence depends on the facts pointing to the motive that prompted the flight or escape. *State* v. *Piskorski*, 177 Conn. 677, 723, 419 A.2d 866, cert. denied, 444 U.S. 935, 100 S. Ct. 283, 62 L. Ed. 2d 194 (1979). We have previously rejected challenges substantially similar to that presented by the defendant. See *State* v. *Williams*, 27 Conn. App. 654, 663–65, 610 A.2d 672, cert. denied, 223 Conn. 914, 614 A.2d 829 (1992); *State* v. *Briggs*, 17 Conn. App. 648, 656–57, 554 A.2d 1112, cert. denied, 211 Conn. 802, 559 A.2d 1137 (1989).

The defendant was arrested on June 28, 1992,[3] after having admitted to Howard, on June 8, 1992, his involvement in a number of the incidents at issue in this case. Further, on June 9, 1992, the defendant observed one of his victims, Proto, identifying him while he was being arraigned on other charges. Under these circumstances,

---

[3] The jury was informed of the date of arrest through the testimony of the state's witness, Howard.

the trial court properly admitted evidence of the defendant's attempted escape on August 28, 1992, and properly instructed the jury on the inferences that could be drawn from that evidence.

## II

The defendant next claims that the evidence was insufficient to sustain his conviction for larceny in the second degree for the May 16, 1992 theft of the Proto vehicle. Specifically, he contends that the state did not present sufficient evidence to establish that the value of the motor vehicle exceeded $5000. General Statutes § 53a-123 (a) (1).[4] We do not agree.

The facts relevant to this claim are as follows. Detective Ralph Puglia, a law enforcement officer with the West Haven police department for twenty-seven and one-half years, testified that he was assigned to the New Haven county auto theft task force. His duties in that position included investigating "chop shops," the sale of cars and carjackings. One of his specific duties was to value vehicles that had been stolen. Puglia informed the jury of the value of each of the four stolen cars at the time they were stolen in May, 1992. Puglia testified that he did not view and appraise each car separately, but used the "red book," which is a well known publication that is utilized by used car dealers to determine the sales prices of used cars. Puglia characterized the use of the red book as the "generally accepted method of determining the value of an automobile." He informed the jury that the figures he used represented the "average retail value" of the cars at the time of the thefts. He acknowledged that any car could be worth more or less than the price listed. When asked

---

[4] General Statutes § 53a-123 (a) provides in relevant part: "A person is guilty of larceny in the second degree when he commits larceny as defined in section 53a-119 and: (1) The property consists of a motor vehicle, the value of which exceeds five thousand dollars . . . ."

about the value of Proto's 1988 Oldsmobile Cutlass Cierra, Puglia testified that it was between $5500 and $6200.

In reviewing a claim involving sufficiency of the evidence, we apply a two part test. "We first review the evidence presented at trial, construing it in the light most favorable to sustaining the facts . . . impliedly found by the jury. We then decide whether, upon the facts thus established and the inferences reasonably drawn therefrom . . . the jury could reasonably have concluded that the cumulative effect of the evidence established the defendant's guilt beyond a reasonable doubt. . . ." (Internal quotation marks omitted.) *State* v. *Sivri*, 231 Conn. 115, 132, 646 A.2d 169 (1994). "[W]e give deference not to the hypothesis of innocence posed by the defendant, but to the evidence and the reasonable inferences drawn therefrom that support the jury's determination of guilt." *State* v. *Dukes*, 46 Conn. App. 684, 690, 700 A.2d 119 (1997).

The defendant's sufficiency claim is not an attack on the competency of the state's witness to testify as to the value of the car, but rather on the substance of his testimony.[5] The defendant argues that because the state's expert testified that he had never seen or inspected the car, there was insufficient evidence before the jury to find that the car was valued at more than $5000.

We do not agree that under these circumstances, an inspection is a prerequisite to an expert's appraisal. If the stolen vehicle had been recovered, destroyed or not recovered at all, testimony as to its value at the time

---

[5] The determination of the qualification of an expert is a matter for the discretion of the trial court. *Siladi* v. *McNamara*, 164 Conn. 510, 513, 325 A.2d 277 (1973). "Expertise may come from practical experience or study alone." *State* v. *Wallace*, 181 Conn. 237, 241, 435 A.2d 20 (1980).

of the theft would certainly have been permitted without an inspection. Moreover, the defendant does not claim on appeal that Puglia's testimony was based on information derived from an untrustworthy source.

We conclude that the state presented sufficient evidence for the jury to have found that at the time of the theft, the value of Proto's automobile exceeded $5000.

The judgment is affirmed.

In this opinion the other judges concurred.